## FARRINGTON *v.* TENNESSEE.

The charter of a bank, granted by the legislature of Tennessee, provides, that the bank " shall pay to the State an annual tax of one-half of one per cent on each share of the capital stock subscribed, which shall be in lieu of all other taxes." *Held*, 1. That this provision is a contract between the State and the bank, limiting the amount of tax on each share of the stock. 2. That a subsequent revenue law of the State, imposing an additional tax on the shares in the hands of stockholders, impairs the obligation of that contract, and is void.

ERROR to the Supreme Court of the State of Tennessee.

The Union and Planters' Bank of Memphis is a banking corporation, doing business at Memphis, Shelby County, Tennessee, organized under a charter granted by the General Assembly of that State March 20, 1858, and amended Feb. 12, 1869, the tenth section of which provides that " said company shall pay

to the State an annual tax of one-half of one per cent on each share of the capital stock subscribed, which shall be in lieu of all other taxes."

Sect. 1 of an act of the General Assembly of 1869–70, c. 81, provides: "All shares of stock in any bank, institution, or company, now or hereafter incorporated by or in pursuance of any law of this State or any other State, . . . shall be valued and assessed, and subject to taxation."

The bank paid the said tax of one-half of one per cent for the year 1872.

Farrington was throughout that year the owner of one hundred and fifty shares of the stock of the bank, upon which the State and the county of Shelby, severally claiming the right under that act to do so, assessed against him for that year, taxes at the same rate that they were assessed and levied upon other taxable property. He resisted the payment of them, upon the ground that, by sect. 10 of the charter, the bank, its franchises and capital stock, and also the shares of stock of the individual stockholder, were subject to no taxation other than the specific sum nominated in the charter; and that the act in question impaired the obligation of the contract stipulating to accept that sum in lieu of all other taxes, and was, therefore, in violation of sect. 10, art. 1, of the Constitution of the United States.

A suit was brought to test the validity of the assessment in the Second Chancery Court of Shelby County; and it was agreed, that, in the event of a decision adverse to Farrington, judgment should be rendered against him for $60 and $180, the amount of the taxes assessed by the State and county respectively, with interest from the first day of January, 1873. If the decision should be in his favor, then the judgment should be that said taxes were illegally assessed; that said shares of stock were exempt from all other taxation except the aforesaid one-half of one per cent to the State, as provided in the tenth section of the bank's charter; and, further, that the collection of said taxes be enjoined, and such other appropriate decree rendered as the court might deem proper, in order to protect him and his assigns from taxation on said stock. Each party reserved the right of appeal. The court rendered a decree enjoining the collection of the taxes, which was reversed by

the Supreme Court of the State, on the ground that the said shares of stock were not the property or thing exempted, but other and different, and so were not within the protection of the charter and of the Constitution of the United States; and it was adjudged that Farrington should pay to the State and the county respectively the said sums of money assessed upon his shares of stock.

Farrington thereupon sued out this writ of error.

The case was argued by *Mr. H. E. Jackson* and *Mr. L. D. McKisick* for the plaintiff in error, and by *Mr. J. B. Heiskell*, Attorney-General of Tennessee, and *Mr. S. P. Walker*, for the defendant in error.

MR. JUSTICE SWAYNE delivered the opinion of the court.

This case lies within narrow limits. The question to be decided arises under the Constitution of the United States. The ground of the discussion has been well-trodden by our predecessors. Little is left for us but to apply the work of other minds. The facts are agreed by the parties, and may be briefly stated.

The Union and Planters' Bank of Memphis was duly organized under a charter granted by the Legislature of Tennessee, by two acts, bearing date respectively on the 20th of March, 1858, and the 12th of February, 1869. Since its organization, it has been doing a regular banking business. Its capital stock subscribed and paid in amounts to $675,000, divided into six thousand seven hundred and fifty shares of $100 each. Farrington, the plaintiff in error, was, throughout the year 1872, the owner of one hundred and fifty shares, of the value of $15,000.

The tenth section of the charter of the bank declares "that the said company shall pay to the State an annual tax of one-half of one per cent on each share of the capital stock subscribed, which shall be in lieu of all other taxes."

The State of Tennessee and the county of Shelby claiming the right, under the revenue laws of the State, to tax the stock of the plaintiff in error, assessed and taxed it for the year 1872. It was assessed at its par value. The tax imposed by the State was forty cents on the $100, making the State tax $60. The

county tax was $1.20 on the $100, making the county tax $180.

The plaintiff in error denies the right of the State and county to impose these taxes. He claims that the tenth section of the charter was a contract between the State and the bank ; that any other tax than that therein specified is expressly forbidden ; and that the revenue laws imposing the taxes in question impair the obligation of the contract. The Supreme Court of the State adjudged the taxes to be valid. The case was thereupon removed to this court by the plaintiff in error for review.

A compact lies at the foundation of all national life. Contracts mark the progress of communities in civilization and prosperity. They guard, as far as is possible, against the fluctuations of human affairs. They seek to give stability to the present and certainty to the future. They gauge the confidence of man in the truthfulness and integrity of his fellowman. They are the springs of business, trade, and commerce. Without them, society could not go on. Spotless faith in their fulfilment honors alike communities and individuals. Where this is wanting in the body politic, the process of descent has begun, and a lower plane will be speedily reached. To the extent to which the defect exists among individuals, there is decay and degeneracy. As are the integral parts, so is the aggregated mass. Under a monarchy or an aristocracy, order may be upheld and rights enforced by the strong arm of power. But a republican government can have no foundation other than the virtue of its citizens. When that is largely impaired, all is in peril. It is needless to lift the veil and contemplate the future of such a people. *Trist* v. *Child*, 21 Wall. 441 ; 1 Montesquieu's Spirit of Laws, 25. History but repeats itself. The trite old aphorism, that " honesty is the best policy," is true alike of individuals and communities. It is vital to the highest welfare.

The Constitution of the United States wisely protects this interest, public and private, from invasion by State laws. It declares that " no State shall . . . pass any . . . law impairing the obligation of contracts." Art. 1, sect. 10. This limitation no member of the Union can overpass. It is one of

the most important functions of this tribunal to apply and enforce it upon all proper occasions.

This controversy has been conducted in a spirit of moderation and fairness eminently creditable to both parties. The State is obviously seeking only what she deems to be right. The judges of her own highest court, whence the case came here, were divided in opinion.

Contracts are executed or executory. A contract is executed where every thing that was to be done is done, and nothing remains to be done. A grant actually made is within this category. Such a contract requires no consideration to support it. A gift consummated is as valid in law as any thing else. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. An executory contract is one where it is stipulated by the agreement of minds, upon a sufficient consideration, that something is to be done or not to be done by one or both the parties. Only a slight consideration is necessary. *Pillans* v. *Van Mierop*, 3 Burr. 1663; *Forth* v. *Stanton*, 1 Saund. 210, note 2, and the cases there cited.

The constitutional prohibition applies alike to both executory and executed contracts, by whomsoever made. The amount of the impairment of the obligation is immaterial. If there be any, it is sufficient to bring into activity the constitutional provision and the judicial power of this court to redress the wrong. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535.

The doctrine of the sacredness of vested rights has its root deep in the common law of England, whence so much of our own has been transplanted. Kent, then chief justice, said: It is a principle of that law, "as old as the law itself, that a statute even of its omnipotent Parliament is not to have a retrospective effect. *Nova constitutio futuris formam imponere debet et non preteritis.* Bracton, lib. 228; 2 Inst. 292." *Dash* v. *Van Kleeck*, 7 Johns. (N. Y.) 477. See also *Society, &c.* v. *Wheeler et al.*, 2 Gall. 105, and Broom's Legal Maxims, 34.

It was settled at an early period that it was the prerogative of the king to create corporations; but he could not grant the same identical powers to a second corporation while the prior one subsisted, and, unless the power was reserved, he could not alter, amend, or annul a charter without the consent of the cor-

porate body to which it belonged. To the extent of such assent amendments were effectual, and no further. *Dartmouth College* v. *Woodward, supra; The King* v. *Passmore,* 3 T. R. 199, and the cases cited.

In the worst times of English history no attempt was made by the crown to do either of these things *in invitum.*

Near the close of the reign of Charles the Second, the charters of many cities were wrested from them. The case of the City of London was the most memorable. It was done under the forms of law, by means of a corrupt judiciary. After the Revolution of 1688, and the accession of William and Mary to the throne, the charter of the metropolis was restored, and immunity was given to it, by an act of Parliament, against such assaults in future. 3 Bl. Com. 264; 2 Campbell's Lives of the Chief Justices, 41.

It is the theory of the British Constitution that Parliament is omnipotent. It can pass bills of attainder and acts of confiscation. Gibbon's Autobiography, 14. It can also create and destroy corporations. But these things involve the exercise, not of its ordinary, but of an extraordinary power, not unlike that of the Roman emperors, sometimes applied in moulding and administering the civil law in special cases.

In *The King* v. *Passmore, supra,* Justice Buller said he " considered the grant of incorporation to be a compact between the crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves to " carry out the objects of the grant.

The question whether there is in such cases a contract within the meaning of the contract clause of the Constitution of the United States came for the first time before this court in the Dartmouth College case. A college charter was granted by the king before the American Revolution. The State of New Hampshire, by several acts of her legislature, of the 27th of June and of the 18th and 26th of December, 1816, attempted materially to change the original charter and modify the government of the institution which had grown up under it. The college resisted. The case was brought here for final decision. It was argued at the bar with consummate ability. The judg-

ments of the justices of this court who delivered opinions were characterized by a wealth of learning and force of reasoning rarely equalled. Perhaps the genius of Marshall never shone forth in greater power and lustre.

It was said, among other things, that the ingredients of a contract are parties, consent, consideration, and obligation. The case presented all these. The parties were the king, and the donees of the powers and privileges conferred. Consent was shown by what they did. The consideration was the investment of moneys for the purposes of the foundation, the public benefits expected to accrue, and an implied undertaking of the corporation faithfully to fulfil the duties with which it was charged. The obligation was to do the latter, under the penalty of forfeiture in case of " non-user, misuser, or abuser." On the part of the king there was an implied obligation that the life of the compact should be subject to no other contingency. The question decided in that case has since been considered as finally settled in the jurisprudence of the entire country. Murmurs of doubt and dissatisfaction are occasionally heard; but there has been no reargument here, and none has been asked for. The same doctrine has been often reaffirmed in later cases. The last one is *New Jersey* v. *Yard*, decided at this term, *supra*, p. 104. In none of them has there been a dissent upon this point.

In cases involving Federal questions affecting a State, the State cannot be regarded as standing alone. It belongs to a union consisting of itself and all its sister States. The Constitution of that union, and "the laws made in pursuance thereof, are the supreme law of the land, . . . any thing in the Constitution or laws of any State to the contrary notwithstanding ; " and that law is as much a part of the law of every State as its own local laws and Constitution. *Farmers' & Mechanics' Bank* v. *Deering*, 91 U. S. 29.

Yet every State has a sphere of action where the authority of the national government may not intrude. Within that domain the State is as if the union were not. Such are the checks and balances in our complicated but wise system of State and national polity.

This case turns upon the construction to be given to the

tenth section of the charter of the bank. Our attention has been called to nothing else.

The exercise of the taxing power is vital to the functions of government. Except where specially restrained, the States possess it to the fullest extent. *Prima facie* it extends to all property, corporeal and incorporeal, and to every business by which livelihood or profit is sought to be made within their jurisdiction. When exemption is claimed, it must be shown indubitably to exist. At the outset, every presumption is against it. A well-founded doubt is fatal to the claim. It is only when the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported. *West Wisconsin Railway Co.* v. *Board of Supervisors,* 93 U. S. 595; *Tucker* v. *Ferguson,* 22 Wall. 527.

Can the exemption here in question, examined by the light of these rules, be held valid?

Upon looking into the section, several things clearly appear : 1. The tax specified is upon each share of the capital stock, and not upon the capital stock itself. 2. It is upon each share subscribed. Nothing is said about what is paid in upon it. That is immaterial. The fact of subscription is the test, and that alone is sufficient. 3. This tax is declared to be "in lieu of all other taxes." Such was the contract of the parties.

The capital stock and the shares of the capital stock are distinct things. The capital stock is the money paid or authorized or required to be paid in as the basis of the business of the bank, and the means of conducting its operations. It represents whatever it may be invested in. If a large surplus be accumulated and laid by, that does not become a part of it. The amount authorized cannot be increased without proper legal authority. If there be losses which impair it, there can be no formal reduction without the like sanction. No power to increase or diminish it belongs inherently to the corporation. It is a trust fund, held by the corporation as a trustee. It is subject to taxation like other property. If the bank fail, equity may lay hold of it, administer it, pay the debts, and give the residuum, if there be any, to the stockholders. If the corporation be dissolved by judgment of law, equity may interpose and perform the same functions. *Wood* v. *Dummer,*

3 Mas. 308; *Curran* v. *Arkansas*, 15 How. 304; *Gordon* v.
*The Appeal Tax Court*, 3 id. 133; *People* v. *The Commis-
sioners*, 4 Wall. 244; *Van Allen* v. *The Assessors*, 3 id. 573;
*Queen* v. *Arnaud*, 9 Ad. & E. N. s. 806; *Bank Tax Cases*,
2 Wall. 200.

The shares of the capital stock are usually represented by
certificates. Every holder is a *cestui que trust* to the extent
of his ownership. The shares are held and may be bought and
sold and taxed like other property. Each share represents an
aliquot part of the capital stock. But the holder cannot touch
a dollar of the principal. He is entitled only to share in the
dividends and profits. Upon the dissolution of the institution,
each shareholder is entitled to a proportionate share of the
residuum after satisfying all liabilities. The liens of all cred-
itors are prior to his. The corporation, though holding and
owning the capital stock, cannot vote upon it. It is the right
and duty of the shareholders to vote. They in this way give
continuity to the life of the corporation, and may thus control
and direct its management and operations. The capital stock
and the shares may both be taxed, and it is not double taxation.
The bank may be required to pay the tax out of its corporate
funds, or be authorized to deduct the amount paid for each
stockholder out of his dividends. Angell & A. on Corp.,
sects. 556, 557; *Union Bank* v. *The State*, 9 Yerg. (Tenn.,
490; *Van Allen* v. *The Assessors, supra ; Bradley* v. *The Peo-
ple*, 4 Wall. 459 ; *Queen* v. *Arnaud, supra ; National Bank* v.
*Commonwealth*, 9 Wall. 353; *The State* v. *Branin*, 3 Zab. (N. J.)
484 ; *M' Culloch* v. *Maryland*, 4 Wheat. 316.

There are other objects in this connection liable to taxation.
It may be well to advert to some of them.

1. The franchise to be a corporation and exercise its powers
in the prosecution of its business. Burroughs on Taxation,
sect. 85; *Hamilton* v. *Massachusetts*, 6 Wall. 632; *Wilmington
Railroad* v. *Reid*, 13 id. 264.

2. Accumulated earnings. *The State* v. *Utter*, 34 N. J. L.
493 ; *The St. Louis Mutual Insurance Co.* v. *Charles*, 47 Mo. 462.

3. Profits and dividends. *The Attorney-General* v. *Bank, &c.*,
4 Jones (N. C.) Eq. 287.

4. Real estate belonging to the corporation and necessary

for its business.  *Wilmington Railroad* v. *Reid, supra; The Bank of Cape Fear* v. *Edwards,* 5 Ired. (N. C.) L. 516.

5. Banks and bankers are taxed by the United States: 1. On their deposits. 2. On the capital employed in their business. 3. On their circulation. 4. On the notes of every person or State bank used and paid out for circulation. Rev. Stat. 673 *et seq.*

The States are permitted, in addition, to tax the shares of the national banks. Id. 1015.

This enumeration shows the searching and comprehensive taxation to which such institutions are subjected, where there is no protection by previous compact.

Unrestrained power to tax is power to destroy. *M'Culloch* v. *Maryland, supra.*

When this charter was granted, the State might have been silent as to taxation. In that case, the power would have been unfettered. *The Providence Bank* v. *Billings,* 4 Pet. 514. It might have reserved the power as to some things, and yielded it as to others. It had the power to make its own terms, or to refuse the charter. It chose to stipulate for a specified tax on the shares, and declared and bound itself that this tax should be "in lieu of all other taxes."

There is no question before us as to the tax imposed on the shares by the charter. But the State has by her revenue law imposed another and an additional tax on these same shares. This is one of those "other taxes" which it had stipulated to forego. The identity of the thing doubly taxed is not affected by the fact that in one case the tax is to be paid vicariously by the bank, and in the other by the owner of the share himself. The thing thus taxed is still the same, and the second tax is expressly forbidden by the contract of the parties. After the most careful consideration, we can come to no other conclusion. Such, we think, must have been the understanding and intent of the parties when the charter was granted and the bank organized. Any other view would ignore the covenant that the tax specified should be "in lieu of all other taxes." It would blot those terms from the context, and construe it as if they were not a part of it.

There is no reservation or discrimination as to any "other

tax." All are alike included. Such is the natural effect of the language used. The most subtle casuistry to the contrary is unavailing. Under such a contract between individuals, a doubt could not have existed. It may as well be said the power is reserved to tax any thing else, as further to tax the shares. We cannot so hold, without interpolating into the clause a term which it does not contain. This we may not do. Our duty is to enforce the contract as we find it, and not to make a new one. If it was intended to make the exception claimed from the universality of the exemption as expressed, it would have been easy to say so, and it is fairly to be presumed this would have been done. In the absence of this expression, we can find no evidence of such an intent. Our view is fully sustained by the leading authorities upon the subject. We will refer to a few of them.

In. *The Binghampton Bridge*, 3 Wall. 51, it was declared by the act of the legislature authorizing the bridge to be built that it should not be lawful to build any other bridge within two miles above or below the one so authorized. This court held the inhibition to be a covenant, and upheld and enforced the restriction against the authority conferred by a later act of the legislature authorizing a bridge to be so built.

In *Wilmington Railroad* v. *Reid, supra*, the charter declared that " the property of said company and the shares therein shall be exempt from any public charge or tax whatsoever." The legislature passed laws taxing the entire franchise and rolling-stock, and certain lots of land necessary to the business of the company. This court held the exemption to be a contract, and adjudged the laws to be void.

*The Union Bank* v. *The State*, 9 Yerg. (Tenn.) 490, is a case marked by eminent judicial ability and careful thought. There it was stipulated, " that, in consideration of the privileges granted by this charter, the bank agrees to pay to the State annually the one-half of one per cent on the amount of the capital stock paid in by stockholders other than the State."

It was held that a further tax on the capital stock was void, but that the State might tax the shares in the hands of individuals.

In the case before us, the charter tax is upon the shares.

The tax complained of is a further tax on those shares. Without the phrase, "in lieu of all other taxes," the parallelism is complete. A further tax could no more be imposed upon the shares in one case than upon the capital stock in the other. The same negative considerations apply to both.

In *The Bank of Cape Fear* v. *Edwards, supra,* the charter provided "that a tax of twenty-five cents on each share of stock owned by individuals in said bank shall be annually paid into the treasury of the State by the president or cashier of the said bank on or before the first day of October in each year, and the said bank shall not be liable to any further tax." It was held that the bank was liable to no other tax, State or county, and that the banking-house and the lot upon which it stood was within the exemption.

*Gordon* v. *The Appeal Tax Court* seems to us conclusive of the case in hand. The legislature of Maryland continued the charters of certain banks on condition that they would make a road and pay a school tax; and it was provided that, upon any of the banks complying, the faith of the State was pledged not to impose any further tax or burden upon them during the continuance of their charters under the act.

It was held by this court that this was a contract, and that it exempted the stockholders from a tax levied upon them as individuals, according to the amount of their stock.

Comment here is unnecessary. The points of analogy are too obvious and cogent to require remark. See also *State Bank of Ohio* v. *Knoop,* 16 How. 369; *Dodge* v. *Woolsey,* 18 id. 331; and *Home of the Friendless* v. *Rouse,* 8 Wall. 430.

The decree of the Supreme Court of Tennessee will be reversed, and the case remanded with directions to enter a decree in favor of the plaintiff in error; and it is          *So ordered.*

NOTE. — In *Dunscomb* v. *Tennessee, Wicks* v. *Same, Neely* v. *Same,* error to the Supreme Court of the State of Tennessee, which were argued by the same counsel as was the preceding case, and in *Hill* v. *Tennessee,* which was argued by *Mr. D. E. Myers* for the plaintiff in error, and by *Mr. J. B. Heiskell,* Attorney-General of Tennessee, and *Mr. S. P. Walker,* for the defendant in error, MR. JUSTICE SWAYNE, in delivering the opinion of the court, remarked: These cases are all disposed of by the opinion in *Farrington* v. *Tennessee, supra,* p. 679. The questions are substantially the same as in that case, and the results must be the same. The decrees of the Supreme Court of Tennessee are reversed, and the cases will be remanded with directions to enter decrees in favor of the respective plaintiffs in error.

Mr. Justice Strong, with whom concurred Mr. Justice Clifford and Mr. Justice Field, dissenting.

I cannot concur in the judgments entered in these cases. If there be any doctrine founded in justice, and necessary to the safety and continued existence of a State, it is that all presumptions are against the legislative intent to relinquish the power of taxation over any species of property. In *The Providence Bank* v. *Billings*, 4 Pet. 514, Chief Justice Marshall, speaking for the court, said: "As the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon does not appear." In *The Ohio Life Insurance and Trust Co.* v. *Debolt*, 16 How. 416, Chief Justice Taney, speaking of legislative acts incorporating companies, said: "The rule of construction in cases of this kind has been well settled by this court. The grant of privileges and exemptions to a corporation are (is) strictly construed against the corporation and in favor of the public. Nothing passes but what is granted in clear and explicit terms. And neither the right of taxation nor any other power of sovereignty which the community have an interest in possessing undiminished will be held by this court to be surrendered, unless the intention to surrender is manifested by words too plain to be mistaken." This doctrine we have many times reiterated and applied. And I do not understand that it is now denied. But I think a majority of my brethren, in the judgments now given, have failed to apply it to the construction of the acts of the Tennessee legislature under consideration in these cases.

One other thing, it appears to me, should be regarded as settled beyond doubt. It is that a tax upon a corporation proportioned to the capital stock, or to the number of shares of its capital stock, is a different thing from a tax upon the individual shareholders of stock in the corporation. The capital stock, and the shares of that stock in the hands of stockholders, are different properties, and consequently distinct subjects for taxation. An exemption of the one is not of itself an exemption of the other, nor is the taxation of the one a tax upon the other in such a sense as to interfere with any exemption the lat-

ter may have from taxation. In *The Delaware Railroad Tax*, 18 Wall. 206, a clause in a charter providing that a company should, in addition to other taxes, pay to the treasurer of the State, for its use, one-fourth of one per cent upon the actual cash value of every share of its capital stock, was held to be not a tax upon the shares of the individual stockholders, but a tax on the corporation, determined by a rule which, though arbitrary, was yet approximately just. So, in *Van Allen* v. *The Assessors*, 3 id. 573, this court said a tax on shares of stock is not a tax on the capital of a bank, and that the shares are a distinct, independent interest or property held by the stockholder, and, like any other property that may belong to him, subject to taxation.

If, now, these two acknowledged doctrines are allowed to have their just effect upon the decision of these cases, I cannot see how the stockholders in the several corporations whose charters we are requested to construe can claim an exemption from taxation upon their individual shares of stock. The exemption clause in the charters of two of the companies is: " Said institution shall pay to the State an annual tax of one-half of one per cent on each share of capital stock subscribed, which shall be · in lieu of all other taxes." The exemption clause in two other of the charters is in substantially the same words, except that the word " company " is substituted for the word " institution." The clause in the fifth charter reads thus : " That there shall be levied a State tax of one-half of one per cent upon the amount of capital stock actually paid in, to be collected in the same way and at the same time as other taxes are by law collected, which shall be in lieu of all other taxes and assessments."

I agree with the majority of the court that there is no substantial difference in the extent of the exemption offered in these several charters, though there is some difference in their phraseology. But I think that the benefit of the exemption is in each case for the corporation. It was not intended for the individual stockholder. The legislature were dealing with the proposed corporations. The corporate power granted and the immunities allowed were to the corporations, and the contract found in the charter was with the artificial being created,

rather than with the natural persons who might have an inter-
est in them.  The language of the acts is, the "institution"
shall pay, or the "company" shall pay, an annual tax, which
shall be in lieu of all other taxes.  It was, therefore, the in-
stitutions or corporations the legislature had in view, alike in
imposing the tax and granting the immunity, and not the natural
persons who might happen to own shares of stock in the cor-
porations.  It is true that in several of the charters the corpo-
rations are required to pay a tax on each share of capital stock
subscribed, and in one upon the amount of capital stock paid
in.  Hence it has been argued the legislature had shares in
view ; and from this the further inference is sought to be drawn,
that the purpose was to tax alike the corporations and the
stockholders, and to exempt both from all other taxation.
Such a construction is, however, directly in conflict with the
ruling in *The Delaware Railroad Tax, supra,* and with the ex-
pressed declaration that the company or institution shall pay
the tax to the State, which was to be in lieu of other taxation.
Besides, the reference to each share of capital stock subscribed
is easily accounted for, without holding that the shareholder,
as well as the companies, were intended to be exempted.  The
amount of capital stock authorized for each company was fixed
by its charter, and divided into shares.  It was quite possible
that the whole stock authorized might not be subscribed.  In
view of this, the companies were required to pay a tax, not upon
their entire authorized capital, but to the extent of the shares
subscribed.  If such was the intent of the legislature, reference
to the shares was necessary, and it raises no implication that
the tax imposed was designed to be for the individual interest
of the shareholders in the corporations, and that the exemption
from further taxation was granted to them.

After all, the true question in these cases is, whether a con-
tract in express terms between the State and a corporation, to
exempt its property and franchises from taxation, shall, by
construction, extend to and exempt the property of individual
stockholders, — property which, for the purposes of taxation,
is entirely different from that of the corporation.  I think
there is no ground for such a construction ; none for any such
implication.  If, however, I am mistaken, it is certainly true

that such a construction is not necessary. The words of the charter granting the exemption are fully satisfied by confining their operation to the corporations themselves; and I do not feel at liberty to give them a broader significance, in view of the settled rule I have noticed, that a State's right of taxation will not be held to have been surrendered unless the intention to surrender is manifested in words too plain to be mistaken. Had the legislature intended to extend the exemption beyond the companies themselves, it would have been easy to place the intent beyond doubt, by simply saying the tax should be in lieu of all other taxation of the company or its stockholders. But nothing like this, or equivalent to it, is found in the charter.

I find nothing in *Gordon* v. *The Appeal Tax Court*, 3 How. 133, so much relied upon by the plaintiffs in error, necessarily inconsistent with what I have said. That case has not been well understood. The circumstances were peculiar, and the decision rendered should be considered with reference to the peculiar facts which appeared in it. What was, in fact, decided we had occasion to observe in *People* v. *The Commissioners*, 4 Wall. 244, where Mr. Justice Nelson directed attention to the circumstances that more or less controlled the judgment.

For these reasons, which I have not time to elaborate, I think the judgments of the Supreme Court of Tennessee should be affirmed.