Carr, J.
This is an action of contract to recover $580.00 paid to the defendant for twenty shares of the capital stock of the Farr Alpaca Company, alleged to have been sold to the plaintiff in violation of the Sale of Securities Act. The case was tried on an agreed statement of facts each party reserving the right to introduce further evidence. From this agreed statement it appears that the Farr Alpaca Co. was a Massachusetts business corporation, manufacturing textiles; that before June 8, 1933, its outstanding stock consisted of 140,000 shares of capital stock of a par value of $100 each, or a total of $14,000,000; that on June 8, 1933, the par value of the stock was reduced from $100 to $50 by transferring $7,000,000 from “capital stock” to “surplus” on the liability side of the books of the company and by stamping outstanding certificates, “The par value has been reduced to fifty dollars”. Thereafter the stock of the company consisted of 140,000 shares of capital stock of a par value of $50 each, or a total of $7,000,000. *532 As the old certificates were surrendered for transfer, new certificates were issued which bore on their face the words, “Par value fifty dollars each”. The plaintiff received a certificate in this form. It also appears that due notice of intention to sell the stock with a par value of $100 was given, in accordance with the Sale of Securities Act, before the sale to the plaintiff, but that no such notice as to the stock with a par value of $50 was given until after the sale. The sale was not within any of the exemptions specified in sections 3 and 4 of the 1932 amendment of the act, unless it came within the provisions of section 3 (a) relating to an isolated sale. The defendant and its predecessors have been in business as brokers in Boston since 1923.
In disposing of a ruling requested by the plaintiff to the effect that the capital stock of the company with a par value of fifty dollars was a different security from the capital stock with a par value of one hundred dollars, the trial judge ruled that “it is the same stock”. The judge also found that the stock in question was qualified for sale in Massachusetts; that the stóck was sold by the defendant as owner; that it was an isolated sale; and that the defendant had not sold Farr Alpaca stock aside from this transaction for many years.
As the shares with a par value of $100 were qualified for sale under the Sale of Securities Act, and as the stock with a par value of $50 was qualified only if it was the same security as the $100 share, the first question raised by the appeal is whether the share with the reduced par value is the same security as the other.
The argument that the shares with the $100 and with the $50 par value are the same security rests on the proposition that after the change the several stockholders still held the same proportionate interests in the corporation. There are undoubtedly situations where the increase or decrease in *533 the paper capital of a corporation makes no change in the rights of the stockholders, cf. Hood Rubber Co. v. Commonwealth, 238 Mass. 369.
To determine whether this is always so the distinction between capital stock and shares of capital stock and between capital stock and surplus profits must be borne in mind. This has been concisely stated in a decision of the United States Supreme Court, speaking in this instance of a bank. ‘ ‘ The capital stock is the money paid or authorized or required to be paid in as the basis of the business' of the bank, and the means of conducting its operations. It represents whatever it may be invested in. If a large surplus be accumulated and laid by, that does not become a part of it. The amount authorized cannot be increased without proper legal authority. ... No power to increase or diminish it belongs inherently to the corporation. It is a trust fund, held by the corporation as a trustee.” . .. . “The shares of the capital stock are usually represented by certificates. Eivery holder is a cestui que trust to the extent of his ownership. The shares are held and may be bought and sold and taxed like other property. Each share represents an aliquot part of the capital stock. But the holder cannot touch a dollar of the principal. He is entitled only to share in the dividends and profits. Upon the dissolution of the institution, each shareholder is entitled to a proportional share of the residuum after satisfying all liabilities.” Farrington v. Tennessee, 95 U. S. 679, 686, et seq. 5 Thompson on Corporations, 3rd ed., p-r 305.
“Ordinarily dividends can be declared and paid only out of the profits or surplus earnings of the corporation. The rule of law that requires corporations to preserve their capital intact is alone sufficient to prevent the corporation from paying dividends except out of the profits.” . . .
2 Thompson on Corporations, 3rd ed., §5290, §5297. *534 But surplus may be turned into capital and capital into surplus.
In determining whether a stock dividend, declared and issued by a corporation, after the Massachusetts income tax law of 1916, Chap. 269, went into effect, out of profits earned before the act took effect, was taxable, the court said:
“The stock dividend was declared strictly out of an accumulation of earnings applied to business uses and not out of increased market value of capital investment. See Thayer v. Burr, 201 N. Y. 155. That which the stockholder had before was a fractional interest in the property of the corporation. So far as concerned the accumulation of profits, there was a possibility that they might be paid out in whole or in part as a cash dividend by authority of the corporation. By the issue of the stock dividend thai[ possibility is ypne and the stockholder now1 has evidence of a permanent interest in the corporate enterprise of which he cannot be deprived. It is a thing different in kind from the thing which the stockholder owned before. From the viewpoint of the stockholder, he has received in the form of a dividend in stock a thing with which theretofore he could have no tangible dealings. The certificate for the new shares of stock representing the stock dividend may have a materially greater value than the less tactile right to a share in the accumulated profits Avhich he had before.
. The thing of value Avhich is taxed as income, namely the dividend in stock, did not come into his possession or right to possession until the year for which he is taxed. It is this thing of value which is taxable at the time when it comes into his right to possession.” Tax Commissioner v. Putnam, 227 Mass. 522, 535, 536.
On the other hand, “When the capital stock has been legally and properly reduced, the surplus over and above the amount of such capital stock as reduced, could properly *535 be distributed as a dividend”, pro Tided such reduced capital stock was not impaired. 2 Thompson, Corporations, 3rd ed., §5297.
Thus where the capital in the sense of shares was reduced under a New York statute it was said by the court, “But although this was the purpose of the act, yet it is possible that eases may occur where a corporation, having on hand actual, tangible capital, equal to the full nominal amount of its capital stock, may comply with the provisions of the act, and thereby diminish the nominal amount of its capital. In such case the excess of its funds or property actually on hand, over and above the sum which the company is bound to keep as capital (viz, its nominal capital as reduced) .is converted into a surplus fund which it can dispose of by dividing it among its stockholders. Its right to make this distribution depends upon general principles, and not upon any provision of the act of 1878.” Strong v. Brooklyn Cross-Town R. R. Co., 93 N. Y. 426. Seely v. N. Y. Nat. Exchange Bk., 8 Daly 400, aff. 78 N. Y. 608. cf. Parker v. Mason, 8 R. I. 427.
It is clear from the foregoing discussion that the rights of the shareholders in the.case before us have been changed.
Before the reduction the share holder had evidence of a permanent interest in a capital of $14,000,000. He had a tangible interest in $7,000,000 of assets which thereafter became surplus. . His certificate with a par value of $100 “may have (had), a materially greater value than the less tactile right” (as a holder of shares of par $50) to a share in the surplus. He could require the actual capital to be held as a part of the- permanent investment. Tax Commissioner v. Putnam, 227 Mass. 522, supra.
After the reduction he had lost a “permanent interest” in one half of the corporate enterprise, and he held shares *536 in a corporation with a surplus of $7,000,000 which could be dissipated in dividends.
cf. 2 Thompson, §5297, and eases cited above.
Further than this it is possible that the holders of the certificates of reduced par value may lose their proportional equality. Another vote might be passed to increase the number of the $50 par value shares and the new shares used to discharge obligations or for the general purposes of the corporation. Page v. Whittenton Mfg. Co., 211 Mass. 424. Commonwealth v. U. S. Worsted Co., 220 Mass. 183, 184.
It is no answer to this to say that the change was brought about by vote of the stockholders and that the stock always had the infirmity of being subject to this change. Aside from the fact that if the plaintiff had been a stockholder before the change his vote might have prevented the change, unquestionably the share with the par value of $50 which he holds is not the same security as the share with the par value of $100 previously existing.
To say that the stock was called common stock before the change and that because it is still called common stock after the change, it is the same security, is a mere play on words. Such reasoning would permit change in the whole capital set up but leave the security the same if it kept its name.
The second question has to do with the proposition that even if the stock were not properly qualified for sale under the act, this was an isolated sale and the defendant protected in consequence.
What then is the isolated sale referred to in the statute. In the original act the exemption applies to “Any isolated sale of any security by the owner thereof, or his representative, for the owner's account, such sale not being made in the course of repeated and successive transactions of a like character by such owner or on his account by such *537 representative, and such owner or representative not being the underwriter of such securities”. The words “isolated sale” do not standi alone but are modified by several clauses, including one which reads, “such sale not being made in the course of repeated and successive transactions of a like character”. That a sale is isolated is of no importance unless the other requirements of the definition are met. The paragraph is interpreted in Kneeland v. Emertom, 280 Mass. 371, where, at p. 388, it is said, “The words ‘repeated and successive transactions’ in their context are not too indefinite to inform the ordinary person of their signification. Sales of securities manifestly constitute the ‘transactions’. The words ‘repeated and successive’ are used by way of contrast to the word ‘isolated’, employed earlier in the same sentence. In such context ‘isolated’ sale means one standing alone, disconnected from any other, and ‘repeated and successive’ mean transactions undertaken and performed one after the other” — and at p. 389, “It is not essential to the validity of the statute that it prescribe the exact period of time within which ‘repeated and successive transactions’ must occur because they must be within a reasonable time fixed by the common law in the light of all the circumstances. The phrase ‘transactions of a like character’ in its context refers to ‘sale of any security’ mentioned earlier in the same sentence. The dominant factor is ‘transactions’, and not the particular security. But the transactions must be confined to sales of such securities as fall within the prohibition of §5 and are not excluded from its operation by §3 (b)-(p) inclusive, or other provisions of said c. 110A. The words ‘like character’ import resemblance in salient features and not identity in all particulars. Bliss v. Bliss, 221 Mass. 201, 211.”
It was suggested in Kneeland v. Emerton, p. 381, that the statute put brokers in a class which could not make isolated *538 sales as there described. The court said, “The word ‘owner’ in see. 3 (a) isl used in contradistinction to the words ‘broker’ and ‘salesman’, whose occupations are defined in sec. 2 (e) (f), and for whose registration, regulation and supervision extensive and detailed provisions are made in §§8-11, both inclusive, of said c. 110A. The exception in §3 (a) is designed for the benefit of those persons' who, not being brokers or salesmen, desire to sell securities which they happen to own without splitting their holdings so as to make repeated and successive sales and without being underwriters of such securities.” There is force in this interpretation. In the report of the special commission, House Document 1175 (1921) on which the original act was based, in section 3 of the summary it is stated that certain securities where there is already sufficient public regulation are exempt, “and all private transactions between individuals who are not attempting to sell securities to the public are exempted”. The principal purpose of the report and of the act was the regulation and restriction of brokers who at the same time, if registered, were given exclusive privileges not applying to other persons (j§§5, 9 and 15a) and while the exemption clause of :§3 (a) protects a sale “standing alone ’ ’' it does not protect one if it is a part of ‘ ‘ transactions of a like character” which transactions refer “to ‘sale of any security’ mentioned earlier in the same sentence.” Ordinarily the limitation would hit the broker class for, unless dealing with securities described in §4, they are the ones who are making a business of repeated and successive transactions (§2 (e) ).
The original “Blue Sky” law was superseded by chapter 290 of 1932. This followed a study and report of the Department of Public Utilities (see House Document No. 1299 of 1931). The exemption section which was passed in place of the original section 3 (a) followed the recommendations *539 of the report, and reads as follows: “(a) Any isolated sale; but this exemption shall not include a sale made in the course of repeated and successive transactions of a like character.” The dominant purpose of the amendment of this part of the act as stated by the Commission was to put exemptions of types of sales in section 3 and exemptions of types of securities in section 4, and to do away with the right of the Commission to forbid “isolated sales” and “judicial sales”. The report, p. 3, said “The most significant change consists of rendering absolute the exemption of isolated sales and judicial sales, which, it is felt, cannot be subjected to the numerous restraints of the act within undue interference with elemental rights of property and the judicial process. ”
It would seem under this superseding section that any one, owner or not, may make an “isolated sale” as defined in the act and that the Commission would have no power to forbid it. Otherwise the verbal changes in the section do not change the original meaning, cf. Main v. County of Plymouth, 223 Mass. 66, 69.
The statement of the court in Kneeland v. Emerton, p. 381, suggesting that brokers are in a class outside the isolated sale exemption, was not necessary for that decision, and it is not necessary for ours. Admitting that a broker may make an isolated sale, as above defined, of his own securities, neither he nor another may make a sale of his own securities if it is made in the course of repeated and successive transactions as already described. We think there was error in the way the trial judge disposed of this subject.
In the agreed statement of facts is the following statement: “The defendant and its predecessors have been in the business of a ‘broker’ (within the meaning of Gr. L. Ch. 110A) in Boston since 1923. It purchased and sold *540 stocks of various corporations, including Massachusetts business corporations, during each year. Many of these stocks had to be qualified for sale and were so qualified under G-. L. Ch. 110A, §5. Since 1929 the defendant made no other sales of Farr Alpaca Company stock than the one in question. ’ ’ It may be that the facts there set forth are not enough to require a finding that the defendant in the course of the sale to the plaintiff made “ repeated and successive transactions of a like character”, as defined by the court. But assuming that the shares were not properly qualified, the facts which the plaintiff in his offer of proof offered to show warranted such a finding. Because the trial judge refused to rule that the shares in question were not qualified, because he rejected the plaintiff’s twenty-seventh request, which substantially if not accurately covers the subject of isolated sales, and because of his rejection of the evidence offered, we think there should be a new trial.