**STATE OF ALASKA, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Cook Inlet Region, Inc., Intervenor.**

No. 210–87L.

United States Claims Court.

Nov. 23, 1988.
As Corrected Nov. 29, 1988.

Elizabeth J. Barry, Anchorage, Alaska, attorney of record for plaintiff.

Larry Martin Corcoran, Washington, D.C., with whom was Asst. Atty. Gen. Roger J. Marzulla, for defendant.

Stephen Kristovich, Los Angeles, Cal., attorney of record, for intervenor.

## MEMORANDUM ORDER

REGINALD W. GIBSON, Judge.

*Introduction*

■ Presently pending before this court, and the subject addressed by this memorandum order, is the question—whether to grant Alaska's Motion To Compel Discovery (RUSCC 37(a)) or the government's Motion for Protective Order (RUSCC 26(c)). In order to make the appropriate determination, we will necessarily be compelled to determine whether:

(i) The Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area (T & C) is a valid contract and agreement, in which case the underlying intent of the parties thereto (*i.e.*, a factual inquiry) is discoverable; and

(ii) The executive privilege and/or the deliberative process privilege [1] are valid bars to the entitlement of plaintiff to compel

discovery as to the intent of the framers of the T & C.

*Facts and Parties' Contentions*

Plaintiff, the State of Alaska, filed its initial complaint in this court on April 13, 1987, against the United States seeking: (i) recovery of at least $20,000,000 from the United States for improperly disbursing revenues, from unitized portions of federal oil and gas leases of public land in Alaska, to native corporations not so entitled; (ii) declaratory relief determining the right of Alaska to receive 90% of the mineral revenues arising from the aforementioned areas; and (iii) an injunction against future disbursements by the United States of such revenues to third parties not so entitled. Defendant answered plaintiff's original complaint on August 7, 1987. However, on August 19, 1987, said answer was amended which averred a counterclaim and also ventilated the necessity of including another party to this law suit, *i.e.*, the Cook Inlet Region, Inc. (CIRI), pursuant to RUSCC 24(a). Plaintiff responded to defendant's counterclaim and set-off on September 9, 1987 and March 8, 1988. CIRI's notice of motion (September 17, 1987) to intervene was allowed on October 7, 1987, and it answered Alaska's original complaint on October 7, 1987. Subsequently, on May 6, 1988, plaintiff submitted a first amended complaint, which reiterated its initial claims and also requested an additional $5,000,000 entitlement. On May 23, 1988, the United States and CIRI filed memoranda opposing Alaska's motion to file a first amended complaint, and Alaska replied thereto on June 7, 1988. On August 11, 1988, this court granted Alaska's motion to amend its complaint. 15 Cl.Ct. 276.

During the interim of the foregoing, and apparently in anticipation of a motion to compel, on May 9, 1988, the defendant, pursuant to RUSCC 26(c), filed a motion for protective order against Alaska, "discovering (1) the intent or understanding of the parties to the terms and conditions

---

1. *Cetron Electric Corp. v. United States,* 207 Ct.Cl. 985, 990 (1975), teaches that in the predecessor Court of Claims, binding on this court, the so-called deliberative process privilege is not recognized. As between the foregoing privilege

and the executive privilege, the latter is recognized in this court. *See Deuterium v. United States,* 4 Cl.Ct. 361, 363 (1984), which also distinguishes the two doctrines.

concerning revenues from oil and gas leases ... (2) thoughts, opinions, recommendations or options of past or present federal employees in anticipation of interpreting or applying the revenue allocating provision of section 14(g) of the Alaska Native Settlement Act ... (3) selection of land within federal oil and gas leases by Cook Inlet Region, Inc." In its thrust to convince this court that the motion for protective order be granted, the main focus of the defendant's and intervenor's argument is that— Alaska's goal to discover the *understanding* and/or *intent* of non-congressional supporters of the T & C is irrelevant to an analysis of the rights of the parties under the statute embracing the T & C. Pp. 10–13. Thus, by their quest for a protective order, defendant and intervenor manifest their opposition to Alaska's discovery requests to inspect and review various communications and mental processes of former government workers regarding the applicability and meaning of "the revenue allocating provision of Section 14(g) of ANCSA." Pp. 18–25. Lastly, they posit that Alaska's demand to inquire about the CIRI land selections are not discoverable since they cannot lead to admissible evidence. Pp. 26–27.

Thereafter, on May 20, 1988, Alaska, by motion pursuant to RUSCC 37(a), requested this court to issue an order compelling defendant and intervenor "to respond fully to the Interrogatories, Requests for Admission and Requests for Production submitted to each of them by the state." P. 1. The underlying basis for plaintiff's motion to compel discovery was as follows: First, Alaska asserts that the T & C is a viable contract and thereby the intent of the parties forming the agreement is a relevant discoverable factual consideration. Pp. 12– 19. Second, Alaska asserts that the defendant's defense, that the government's interpretation and application of § 14(g) of ANCSA must be barred against discovery due to the deliberative process privilege, is legally deficient. Pp. 19–24. Third, Alaska argues that the circumstances surrounding CIRI land selections are discoverable due to mistakes in the T & C. Pp. 24–25. Fourth, and finally, Alaska argues that de-

fendant's reasons for failing to comply with the plaintiff's requests are wholly insignificant and inadequate. Pp. 25–29.

In its opposition (June 6, 1988) to Alaska's motion to compel, and reply to Alaska's opposition to its motion for protective order, the defendant raised several points to which plaintiff takes issue, namely:

(i) The T & C is *not* a contract because Alaska failed to demonstrate that said document is more than an agreement. Further, this so-called agreement would be *unenforceable* save validation by both the United States Congress and the Alaskan legislature. Pp. 3–7;

(ii) Neither the T & C (the alleged contract) nor the statutory interpretation containing the intent of the parties is discoverable since: Pub.L. No. 94–204 as well as the T & C are straight-forward and clear; if intent regarding the formation of the T & C is helpful, one may assess only the information synthesized from Congressional intent. Pp. 7–10; and

(iii) Mental, processes, *i.e.,* intent, of government officials are privileged and thereby *not* discoverable. P. 19.

CIRI, the intervenor, followed on June 21, 1988, and filed its opposition to Alaska's motion to compel and concomitantly its support of the United States' motion for a protective order. Similar to arguments set forth by the defendant, intervenor further contends that Alaska should be barred from discovering the intent of the framers of the T & C—*i.e.,* Alaska, the United States, and CIRI—since these parties' intent manifest in the T & C was *not explicitly* adopted by Congress. Therefore, CIRI reasons, Alaska's discovery requests will not, as RUSCC 26(b)(1) sets out, appear to be "reasonably calculated to lead to the discovery of admissible evidence." Pp. 10– 17. Implicit in their argument is CIRI's insistence that Alaska has simply failed to demonstrate that the T & C is a contract. *Id.* Also, CIRI further insists that Alaska's discovery requests, concerning CIRI land selections under the T & C, are not discoverable since: (i) Alaska is vague in specifically discussing what information it

wants; and (ii) there is no dispute as to what the record of land selections set out. Pp. 20–21. Lastly, CIRI asserts that the state, the plaintiff, has not responded adequately to valid and pertinent objections raised by the native corporations regarding discoverable data. Pp. 21–26.

In reiterating the substance of its position in its motion to compel discovery, in a June 22, 1988 memorandum, plaintiff avers that its discovery requests do in fact seek relevant information "reasonably calculated to lead to the discovery of admissible evidence" because: (i) the T & C is a contract; (ii) the intent of the parties to the T & C is a relevant fact and discoverable; and (iii) Congress was aware that the T & C stated that producing oil and gas lands were not to be conveyed. RUSCC 26(b)(1). Additionally, and conversely, the question is, from the defendant's and intervenor's (hereinafter collectively defendant) perspective, whether such discovery is barred by the doctrines of executive privilege and/or deliberative process privilege. We next address the foregoing salient issues.

*Discussion*

I. The T & C is a Contract.

Although no talismanic definition for a "contract" exists, a hornbook definition of this term will, of course, aid in our analysis of the nature of the T & C. Professor Williston, a leading scholar on the subject, wrote "A contract is a promise, or set of promises, for breach of which the law gives a remedy, of the performance of which the law in same way recognizes as a duty." 1 Williston, Contracts § 1 (3d ed. 1957). *See also,* 1 Corbin, Contracts § 3 (1963) ("... a contract is a promise enforceable at law directly or indirectly.") The Supreme Court of the United States stated in *Farrington v. Tennessee,* 95 U.S. 679, 685, 24 L.Ed. 558 (1877), that the essential elements of a contract include "parties, consent, consideration, and obligation." Further *see Russell Corp. v. United States,* 210 Ct.Cl. 596, 608–609 (1976); *Estate of Samuel E. Bogley v. United States,* 206 Ct.Cl. 695, 704–705 (1975).

The Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area, December 10, 1975, was an extensive and far-reaching document. The various portions of this multi-faceted agreement were as follows:

1. Paragraph I discusses the lands which the United States shall convey to CIRI;

2. Paragraph II notes Alaskan land which shall be conveyed to the United States with subsequent conveyance to CIRI;

3. Paragraph III describes other lands which the United States shall convey to Alaska;

4. Paragraph IV sets out CIRI's full entitlements in land and interests;

5. Paragraph V calls for the United States, CIRI, and Alaska to seek laws which will authorize the United States to convey title to native corporations;

6. Paragraph VI remonstrates Alaska from selecting particular tracts of land;

7. Paragraph VII discusses the lands which CIRI shall allocate section 12(b) selections;

8. Section VIII asserts that the United States and CIRI shall support establishing a unit of the National Park System in the Lake Clark area;

9. Paragraph IX stresses that land conveyances to CIRI and/or its village and group corporations, as described in the T & C, shall be construed upon respective conveyance, as transfers within and pursuant to ANCSA;

10. Paragraph X provides that once federal lands to be patented to CIRI are identified, the Secretary of Interior shall review all leases, contracts, permits, rights-of-way, and easements to determine whether the administration of the property may be waived by the Secretary, pursuant to section 14(g) of ANCSA.

11. Paragraph XI asserts that when Alaskan lands "to be conveyed to the United States for CIRI are designated by CIRI pursuant to paragraph II of this document, the state, if so authorized, shall place all revenues received from such lands in es-

crow to be transferred to the Region when appropriate";

12. Paragraph XII stresses that requisite legislation is needed in order to have the United States, Alaska, and CIRI to be unconditionally bound by the T & C;

13. Paragraph XIII provides definitions for a township and land; and

14. Appendices A through G relate to and enlighten descriptions in paragraphs I through XIII.

1975 U.S.Code Cong. & Ad.News 2376, 2397–2401.

Indeed, we believe that a close analysis of the T & C readily discloses that there were knowing consenting parties to the T & C. Moreover, the T & C further illustrates that said consenting parties, *i.e.,* Alaska, the United States, and CIRI, understood their obligations in light of the expressed consideration. For purposes of the pending motions, therefore, the evidence is sufficiently probative of the fact that the T & C meets the minimum requisite elements of, at least, a conditional contract.

Corroborative of the foregoing findings is the language of § 12 of Pub.L. No. 94–204 itself which indicates that the T & C is a well-enumerated *settlement* of land claims in dispute between the United States, CIRI, and Alaska. There § 12(b) of said law clearly and unambiguously provides that "the Secretary *shall* make the following conveyances to the Regions, in accordance with the specific terms, conditions, procedures, convenants, reservations, and other restrictions *set forth in the document entitled Terms and Conditions For Land Consolidation and Management in Cook Inlet Area,* which was submitted to the House Committee on Interior and Insular Affairs on December 10, 1975, *the terms of which are hereby ratified as to the duties and obligations of the United States and the Region, as a matter of law."* Section 12(b)'s discussion that Congress will merely ratify and incorporate the previously established conditions of the T & C, as set out accordingly by the tripartite members, further supports the contention that the T & C is a valid agreement and contract, whose intent was factually formulated by Alaska, the United States, and CIRI. It is that intent, manifested by the provisions and "terms [in the T & C] ... which [Congress] ... ratified as to the duties and obligations [of the parties], as a matter of law."

Additional legislative history, including a statement by Mr. Guy Martin, Commissioner of Natural Resources for Alaska, establishes that Alaska was very satisfied with the *agreement* even though "the final legal form for the agreement isn't even established." Amendments to Alaska Native Claims Settlement Act, Hearings on S. 1469, 94th Cong., 1st Sess. (1975) (statement of Guy Martin, Commissioner of Natural Resources, State of Alaska).

Further supportive of our finding is the fact that H.R.Rep. 94–729, 94th Cong., 1st Sess. 31 persuasively illustrates that the T & C is a *"negotiated settlement"* which "harmonizes conflicting interests" (emphasis added). Moreover, this House Report states that § 12 of Pub.L. No. 94–204 "implements an *agreement reached among the United States, the State of Alaska, the Cook Inlet Regional Corporation,* and other interested parties to resolve the problem Cook Inlet Region, Inc. encountered in realizing its land entitlements under the Settlement Act. That section is general in terms and incorporates into it by reference, the text of the agreement reached by the parties." *Id.,* at 35, U.S.Code Cong. & Admin.News 1975 at 2401–2402 (emphasis added).

Other evidence that the T & C was understood by Congress as a bona fide agreement, which it later ratified, can also be seen in House Report 94–729, which provides that:

The Committee intends that section 12 *and the implementing agreement* be construed together to give effect to the settlement of the Cook Inlet problem in a manner that is fair and equitable to the Cook Inlet Regional Corporation and the other parties.

1975 U.S.Code Cong. & Ad.News 2401–2402.

The necessity for discovering the intent of the three parties to the T & C arises because they are reliable and useful sources as to what the T & C conditionally afforded each party to a ratified agreement. Proof for this assertion can be seen by viewing the "Memorandum of Understanding," signed by the framers of the T & C on August 31, 1976, which states that:

The attached Document, titled Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area, December 10, 1975, [2] as clarified August 31, 1976, *represent the obligations of the parties* signatory hereto *if* the provisions of Section 12(a) of Public Law 94–204 take effect. (emphasis added).

The provisions of § 12(a), *supra,* of course, did "take effect" and the T & C was ratified accordingly. Thus, plaintiff, defendant, and intervenor were, upon their execution, conditionally bound thereby to carry out *the terms and obligations* that were set forth in the T & C, which condition was removed upon ratification. That condition, in no sense, delimits the existence of a "contract" as between the parties, subject to the ratification of the United States and Alaska legislatures. Support for the foregoing is found in Black's Law Dictionary (5th ed.) wherein it defines the verb "ratify" to mean "to confirm." Moreover, to ratify is further defined as "the confirmation of a *previous act done ...,* as, confirmation of a voidable act.... It is equivalent to a previous authorization and relates back to time when act ratified was done...." (emphasis added).

Also, in discussions prior to the enactment of Pub.L. No. 94–204, which incorporated and ratified the T & C, Congressman Young of Alaska stated that the T & C was an agreement and arrangement created by consent of CIRI, Alaska, and the United States. Furthermore, Congressman Young commended the various negotiators for the extensive work undertaken to produce the agreement. 121 Cong.Rec. 40823, 40824. Additional probative evidence that the T &

C is a contract agreement is a September 1, 1976 letter by Mr. Thomas S. Kleppe, Secretary of Interior, to the Honorable James Haley, Chairman, Committee on Interior and Insular Affairs, House of Representatives. In said letter, the Secretary stresses that the document was agreed upon by the tripartite group and whose wishes were ratified by Congress in § 12 of Pub.L. No. 94–204. 122 Cong.Rec. 28817.

■ Against this background, there is no doubt that Congress simply ratified and incorporated a negotiated conditional contract (the T & C) into Pub.L. No. 94–204. Indeed, to hold otherwise, we believe, would result in substantial prejudice to plaintiff's case, if not a miscarriage of justice. We find, therefore, that the parties did form a binding contract (pending U.S. Congressional and Alaskan State Legislature approval) in light of the underlying facts and legislative history. In view of the foregoing findings, since the issue on the merits is—whether the obligatory provisions under the T & C, as ratified, were properly carried out, then, of course, the intent of the signatory parties to that agreement is most relevant. What each party had in mind upon signing same, as to their respective obligations and benefits thereunder, *i.e.,* consideration, is, we find, a question of fact. To this inquiry as contained in plaintiff's efforts to depose certain persons, defendant and intervenor avers executive and deliberative process privileges. This, therefore, brings us to the question of whether such privilege, on the facts at bar, is well taken.

II. The United States and CIRI have failed to show that either of said privileges is applicable.

■ It is, of course, hornbook law that the one who asserts a privilege has the burden of establishing its existence. The underlying theory justifying the existence or the application of executive privilege, against disclosure of intra-agency advisory

---

**2.** *See also* the Memorandum of December 1975 signed by representatives of the three parties, *supra,* which demonstrated an earlier agreement to the stipulations contained in the "Pro-

posed Terms and Conditions For Land Consolidation and Management in the Cook Inlet Area."

communications, centers on the compelling need for frank and candid discussion in the government process. *E.P.A. v. Mink,* 410 U.S. 73, 88–91, 93 S.Ct. 827, 836–38, 35 L.Ed.2d 119 (1973). That is so because, otherwise, "those who expect public dissemination of their remarks may well temper candor with a concern for appearances ... to the detriment of the decisionmaking process." *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106 (1974). Nevertheless, the sanctity of executive privilege is not absolute. *Id.* and *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 141 Ct.Cl. 38, 46–47 (1958). In fact, executive privilege must be narrowly construed to allow discovery in the broadest possible sense, and in at least two instances it can be overcome. *Smith v. F.T.C.,* 403 F.Supp. 1000, 1015 (D.Del. 1975); *Jabara v. Kelley,* 75 F.R.D. 475, 480 (E.D.Mich.1977). First, primarily factual material and communications within or among agencies, when not relating to national security measures, fail to be protected by executive privilege. *E.P.A.,* 410 U.S. at 87–88, 93 S.Ct. at 836; *Bank Line, Ltd. v. United States,* 76 F.Supp. 801, 804 (S.D. N.Y.1948); and *Boeing Airplane Co. v. Coggeshall,* 280 F.2d 654, 660–61 (D.C.Cir. 1960). Also, information which can be extracted from deliberative writings of the agency is also unbridled from government secrecy tactics. *Freeman v. Seligson,* 405 F.2d 1326 (D.C.Cir.1968). Said privilege may also be defeated by a showing of evidentiary need by plaintiffs that outweighs the harm that disclosure of such information may cause to the defendant. *CACI Field Services, Inc. v. United States,* 12 Cl.Ct. 680, 687 (1987); *F.T.C. v. Bramman,* 54 F.R.D. 364 (W.D.Mo.1972); *Black v. Sheraton Corp.,* 371 F.Supp. 97 (D.D.C.1974).

■ Applying the two above factors to the facts of this case convinces this court that the assertion of executive privilege is not sustainable. This is so because we have already found that the *intent* of the framers of the T & C concerns *factual* discussions and information which will aid in resolution of this revenue allocation dispute. Second, communications and materials utile to the resolution of this dispute can be extracted without violating any protective secrets. Finally, and more importantly, the evidence is clear that the need to discover by plaintiff far outweighs any harm inuring to the defendant and intervenor.

Alaska's necessity to inquire into the defendant's and intervenor's analysis of § 14(g) of ANCSA is based on plaintiff's assertion that the "Department of the Interior has interpreted § 14(g) to apply to 100% of the revenues received by the United States from oil and gas leases when CIRI is conveyed any part of the lease, regardless of whether or not the part conveyed produces any of the revenue. This interpretation and application of § 14(g) not only contravenes the stated intent of all three parties to the T & C, it violates the language of § 14(g) itself, and is in conflict with the provisions of the MLA and the Statehood Act." Alaska's Motion to Compel Discovery from the United States and Cook Inlet Region, Inc., May 23, 1988, pp. 19–20. In contrast, argues plaintiff, the potential harm to the United States and CIRI as a result of permitting the necessary discovery of said information, if illicited, is *de minimis.* After all, says plaintiff, this very information will simply aid the parties and this court to gain a better understanding of the true factual circumstances involved in this suit. Indeed, then, as held in *Black, supra,* disclosure must be provided in order to obtain a fair resolution.

Moreover, to be efficacious, a plea of executive privilege must also satisfy three additional criteria. First, as was pointed out in *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 531–32, 97 L.Ed. 727 (1953), the head of the affected agency must himself invoke the privilege. *CACI Field Services, Inc.,* 12 Ct.Cl. at 687. Second, to achieve a valid claim of executive privilege, there must be "a specific designation and description of the documents with its scope as well as precise and certain reasons for preserving their confidentiality." *Black,* 371 F.Supp. at 101. *See United States v. Article of Drug,* 43 F.R.D. 181,

190 (D.Del.1967). Last, an adequate exhibition by the proponent of the executive privilege as to its basis and its role in the confidentiality of governmental communications is essential. *Black,* 371 F.Supp. at 101.

Regarding the requirements set out in *United States v. Reynolds,* the agency and departmental heads, who the United States and CIRI claim are eligible for executive privilege, have failed to personally assert the privilege themselves. No explanation has been forthcoming as to why this element has not been satisfied. With reference to the standards set out in *Black* and *United States v. Article of Drug,* defendant and CIRI have presented their reasons for requesting an executive privilege, but their arguments are not convincing. Similarly, defendant has failed to present proof that disclosure of information relating to this suit, which is reasonably calculated to lead to admissible evidence, is essential for government confidentiality.

■ Helpful to our analysis is the added fact that courts have generally stated that prior to barring an individual's deposition from being taken, the movant must demonstrate that the discovery objected to will likely cause harassment while at the same time be irrelevant to the issue. For example, *see Grinell Corp. v. Hackett,* 70 F.R. D. 326, 333 (D.R.I.1976). Concerning the facts at bar and in the absence of establishing executive privilege, we further find that neither the United States nor CIRI has demonstrated how the scope of Alaska's requests for discovery will result in harassment or oppression to the parties. Moreover, and as previously noted (note 1 *supra*), this court does not recognize deliberative process privilege. *Cetron Electric Corp.,* 207 Ct.Cl. at 990; *Deuterium,* 4 Cl.Ct. at 363.

Lastly, the Freedom of Information Act, codified in portions of the Administrative Procedures Act, 5 U.S.C. § 552(b), provides a number of exemptions for government disclosure, including "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Under this exemption, "courts have required disclosure of essential *factual material* but allowed agencies to withhold documents which reveal their deliberative or policy-making processes" (emphasis added). *Mead Data Central, Inc. v. U.S. Dept. of Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977). The Court of Appeals for the D.C. Circuit held that "factual material *must* be disclosed but advisory material, containing opinions and recommendations, may be withheld" (emphasis added). *Id.* Yet, disclosure of essentially factual material may threaten the advisory aspects of agency decision, and thereby must be exempted for disclosure by § 552(b)(5). *Brockway v. Dept. of the Air Force,* 518 F.2d 1184, 1194 (8th Cir.1975).

■ Here, because the information which Alaska seeks to discover focuses on the factual circumstances regarding the intent of the parties who framed the T & C, exemption 5(b) is also applicable. After all, plaintiff seeks "essential factual material" and thus it is the duty of this court to require disclosure of such information. Presentment of these important materials and information during discovery will undoubtedly aid *both* the parties and this court in embellishing our understanding of this complex suit with true and accurate facts.

Although this court has determined that Alaska's motion to compel discovery is GRANTED against both the United States and CIRI, our decision in no way provides Alaska with the unbridled right to conduct excessive or burdensome techniques in order to obtain irrelevant information from defendant and intervenor. On that basis, and concurrently, the United States' Motion for a Protective Order is DENIED.

IT IS SO ORDERED.