In re C.M. TURTUR INVESTMENTS, INC. d/b/a Chris Turtur Nissan, Debtor.

T.G. MOTORS, INC. OF HOUSTON, Movant,

v.

C.M. TURTUR INVESTMENTS, INC. d/b/a Chris Turtur Nissan, Respondent.

Bankruptcy No. 88–01606–H5–11.

United States Bankruptcy Court, S.D. Texas, Houston Division.

Nov. 7, 1988.

See also, D.C., 95 B.R. 459.

George R. Neely, Houston, Tex., for debtor; Brochstein & Slobin, of counsel.

Suzanne M. Barnett and Beth Nanninga, Houston, Tex., for Nissan Motor Acceptance Corp.; Weil, Gotshal & Manges, of counsel.

Aaron Keiter, Houston, Tex., for Bellfort Nat. Bank; Keiter & Blustein, P.C., of counsel.

Boris Hidalgo, Houston, Tex., for T.G. Motors, Inc. of Houston; Reynolds, Shannon, Miller, Blinn, White & Cook, of counsel.

## ORDER REGARDING MOTION TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS

MARGARET A. MAHONEY, Bankruptcy Judge.

This matter comes before me on the motion of T.G. Motors, Inc., of Houston (T.G.

Motors) to compel the debtor, C.M. Turtur Investments, Inc., d/b/a Chris Turtur Nissan (debtor or Turtur) to assume or reject executory contracts to buy and sell six automobiles. Bellfort National Bank (Bellfort) and Nissan Motor Acceptance Corporation (NMAC) intervened in this motion seeking to have the validity, priority and extent of their alleged liens against the automobiles determined. Pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the District Court's Order of Reference of Bankruptcy Cases and Proceedings, I have jurisdiction over this contested matter. Since the disputed issue turns on the interpretation and application of a specific provision of Title 11, the proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following memorandum opinion shall constitute my findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 made applicable to contested matters by Bankruptcy Rule 9014.

## I. PROCEDURAL HISTORY

Prior to this motion to compel the debtor to assume or reject executory contracts, on June 8, 1988, I ordered Bellfort National Bank (intervenor in this action) to turn over certain documents to the debtor in possession to be held in escrow, pending my decision in this matter. This order was affirmed by the District Court on September 14, 1988 in *C.M. Turtur Investments, Inc., v. Bellfort National Bank, (In re C.M. Turtur Investments, Inc.)*. Civil Action No. H–88–2215 (D.C.S.D.Tex. September 14, 1988).

■ In this contested matter now before me, T.G. Motors seeks to compel the debtor in possession, Turtur, to assume or reject certain contracts it argues are executory. Turtur contests T.G. Motors' motion to compel. Bellfort and NMAC have intervened in this action seeking a determination of the validity, priority and the extent of their liens in the debtor's property. The intervention of these two parties was allowed. The issues that they raise normally are determined in an adversary proceeding pursuant to Bankruptcy Rules 7001, *et seq.*

Notwithstanding the fact that this is a motion to compel the debtor to assume or reject executory contracts, I am determining the issues raised by the intervenors for the following reasons: (1) the due process requirement of notice to interested persons is not a factor because more interested persons received notice of the intervenors' claims under a contested matter than they would have received under an adversary proceeding; (2) no one is prejudiced by my determination of these issues in this contested matter format; (3) a hearing of these issues, which are merely collateral to this contested matter is a more efficient use of the judicial system than requiring a separate and distinct adversary proceeding; (4) the principal issues to be decided are so closely related to the intervenors' collateral issues that a duplication of efforts is avoided; and (5) the intervenors, by asking to intervene and by proceeding without objection have consented to a determination of these issues in this contested matter proceeding.

## II. FACTUAL BACKGROUND

Turtur is a Nissan automobile dealership in Houston, Texas, which filed a Chapter 11 petition on February 22, 1988. During its existence, Turtur has entered into numerous dealer trade agreements with other Nissan dealerships in Houston and, perhaps, elsewhere. Two of these dealer trade agreements are the subjects of this motion.

### 1. Dealer Trade Agreements

It would be useful first to explain the procedure of dealer trade agreements. Typically, in a dealer trade one dealer has a customer who desires a certain model of car with certain specified optional equipment that the dealer does not have in inventory. The dealer will conduct a search through the dealership computer network usually maintained by the manufacturer to determine which dealer has the desired car in its inventory. The dealer needing the car calls the dealer having the car in stock and arranges a trade. Often the second dealer may want a car out of the inventory

of the first dealer as well. If there is no car the second dealer desires, then the second dealer receives cash in exchange for the car traded.

A typical dealer trade is effectuated by the "selling" dealer drafting against the "buying" dealer's bank account with a sight draft.[1] The sight draft used in this type of transaction is an envelope draft since it contains inside the draft envelope or accompanying the draft, the title documents of the car to be traded and the Manufacturer's Statement of Origin (MSO).

The process begins when the "selling" dealer presents a draft by messenger or mail to the "selling" dealer's bank. The "selling" dealer's bank then presents the draft to the "buying" dealer's bank. That bank then calls the "buying" dealer to come in and pick up, or pay for, the draft. But before the draft is picked up, the "buying" dealer examines the enclosed title documents and the MSO to insure all is in order. If it is, then the "buyer" pays the draft. If not, the draft is returned to the "seller's" bank and eventually the "seller" will need to resubmit the draft envelope with the proper documents inside if the buying dealer still wants the automobile requested.

Where two dealers are trading cars, the procedure outlined above is followed by each "selling" and "buying" dealer. In effect, both parties to an exchange of cars are "selling" and "buying" dealers. The cars and title documents are not exchanged directly between dealers for two reasons: (1) to insure payment for the cars before the title documents are passed to the buyer; and (2) to insure that the title documents are in order before payment is actually made. Sight drafts between banks adequately satisfy these concerns of the parties to a dealer trade.

Additionally, each party to a trade will have its own agreement with its bank with respect to the treatment of the sight drafts. With a "selling" dealer, the bank may agree to provide immediate credit to its account upon deposit of the sight draft.[2]

Often this credit is only provisional until the "seller's" bank receives the funds from the "buyer's" bank. Further, internal bank accounts[3] are maintained for depositors of drafts: debiting the bank's internal account when the deposit is made and crediting this account when the funds from the buyer's bank are received by the "seller's" bank. With respect to the "buyer's" bank, when a draft is presented to the bank for payment, if the funds are available in the "buyer's" account, then the account is charged (debited). However, if funds are insufficient, the draft is either returned to the presenting bank (i.e., the seller's bank) or the bank advances funds to the "buyer's" account pursuant to some agreement between the "buyer" and his bank for payment of the draft.[4]

1. Everyone who has a checking accounts knows that a check is not valid unless the party against whose account the check is drawn signs the check. A draft is in many ways like a check, but at the same time, a draft is not a check. The draft looks like a check. In dealer trades, the draft is drawn (or written) and signed by the party to be paid, unlike a check. The draft requires the party upon whose account the draft is drawn, to approve payment before payment is made to the party presenting the draft. The drafts used in this case, sight drafts, are payable upon demand (upon presentation to the bank where the party's account is located upon which the draft is to be charged).

2. In banking terminology, a "credit" is an amount of money added to a customer's account. On the other hand, a "debit" is an amount of money subtracted from a customer's account. These concepts of credits and debits in banking terminology seem the reverse from the use of these terms in accounting terminology. The reason behind the confusion is that the terms are employed from a bank's perspective not the account holders.

3. These internal bank accounts are commonly referred to as "uncollected funds" accounts. Essentially, when a bank's customer deposits a draft or other item to be collected from another bank, the bank will often (by agreement with its customer) provide immediate credit. The depositor's account is credited with the provisional credit and the bank's internal "uncollected funds" account is debited. This allows the bank to follow its customer's uncollected funds on deposit and to charge its customer interest (by agreement) on this amount.

4. As noted later in the opinion, the above discussion is further complicated in this case because Bellfort is the bank of both parties, so that the "selling" dealer's bank and the "buying" dealer's bank are one and the same.

T.G. Motors, another Houston Nissan dealership, entered into two dealer trades with Turtur which are the subject of this motion. The first dealer trade, to avoid confusion, will be referred to as the "two car sale". The second dealer trade will be referred to as the "four car purchase". The six cars in controversy are all in the possession of Turtur.

T.G. Motors asks me to compel Turtur to assume or reject these sales as executory contracts pursuant to 11 U.S.C. § 365(a). T.G. Motors asserts that it paid for the cars involved in the "two car sale", but Turtur never delivered them; thus its contract with Turtur remains executory in that performance remains due by Turtur. Further, T.G. Motors asserts that Turtur failed to pay for four vehicles that it delivered to Turtur as the result of the "four car purchase". T.G. Motors claims the contract remains executory because Turtur never paid for the vehicles.

Bellfort has intervened in this action to protect its alleged claim to an unperfected security interest in all six cars. Bellfort was the bank in common for both Turtur and T.G. Motors. Both made deposits and withdrawals on their respective accounts at Bellfort in the ordinary course of their business. Further, Bellfort acted as collecting agent on drafts deposited into the respective accounts of the dealerships in their dealer trades.

NMAC has intervened to protect its security interest in all six vehicles, claiming that it had floor planned Turtur's inventory through a Wholesale Financing and Security Agreement perfected by NMAC. NMAC's security agreement covers all vehicles in Turtur's inventory including after-acquired assets and proceeds. NMAC is

alleging priority over Bellfort's unperfected security interest, in the event I determine that Bellfort has a valid security interest in any of the six vehicles involved.

### 2. The Two Car Sale[5]

T.G. Motors offered evidence showing that T.G. Motors and Turtur agreed that Turtur would sell two cars out of its inventory for cash to T.G. Motors. However, Turtur offered testimony that the agreed transaction was for four cars, two cars to be traded from each dealer. I find the most credible evidence to be that Turtur and T.G. Motors agreed to trade four unspecified cars, two from each dealer.

The essence of Turtur's testimony was that sometime during the morning of December 3, 1987, a representative of T.G. Motors telephoned James Record, the new car manager of Turtur, wanting to arrange a dealer trade. Turtur agreed and arranged the paper work including the drafts with the enclosed title documents and MSOs that were to be presented to T.G. Motors' bank (Bellfort).[6] The drafts with the enclosed title documents were sent over to Bellfort for deposit to Turtur's account.[7]

T.G. Motors telephoned Turtur later that same morning and informed Turtur that Bellfort would not give immediate credit on the drafts T.G. Motors submitted against Turtur's account. Therefore, T.G. Motors wanted to rescind the dealer trade agreement. By this time, the drafts sent by Turtur drafting T.G. Motors' account had reached Bellfort. Bellfort had provided immediate credit to Turtur's account on the basis of the submitted drafts. However, T.G. Motors, having sent over its own sight drafts (drafting Turtur's account), had re-

---

**5.** The term "two car sale" is somewhat of a misnomer in light of my finding that the transaction involved an exchange of four cars. My reason for doing so is that throughout the hearing, both parties referred to the exchange as the "two car sale". The term "two car sale" does fit in that upon T.G. Motors' rescission of the contract, Turtur had received payment for two cars it "sold" to T.G. Motors, but failed to deliver.

**6.** As previously noted, Bellfort is the bank for both parties and as such it changes hats depending upon the party for whom the bank is acting.

Normally, according to the Tex.U.C.C., a bank acts as collecting agent for its customer who deposits drafts into its account.

**7.** In fact, two drafts were deposited: one on December 3, 1987, and the other on December 4, 1987. The evidence indicates that the drafts were deposited at the same time but one was merely posted later than the other. There was no evidence to indicate that one was deposited before the other.

trieved them from the bank since no immediate credit was available.

As a consequence, the two car sale had fallen through. T.G. Motors would not trade its cars to Turtur, but Turtur had received immediate credit on the drafts it submitted for the two cars to be transferred to T.G. Motors. Curiously, Bellfort did not charge T.G. Motors' account at that time for the drafts upon which it had given Turtur immediate credit. Nothing more was said or done regarding this transaction until Turtur filed his petition in Chapter 11 in February 1988. T.G. Motors made no demand upon Turtur to deliver the cars for which Turtur had received immediate credit prior to Turtur's filing his petition in bankruptcy. No demand letter or other communication was ever sent by T.G. Motors to Turtur demanding the delivery of the cars before Turtur's petition in bankruptcy.

I find from the credible evidence that T.G. Motors rescinded the contract made earlier that same morning to trade four cars with Turtur, two from each dealer.

As noted, Bellfort gave Turtur immediate credit on the drafts Turtur submitted against T.G. Motors' account. The bank credited Turtur's account and debited the bank's internal uncollected funds account. Turtur was charged interest on this uncollected amount which Turtur paid for two months. Bellfort retained the two MSOs to Turtur's vehicles that were included in the now rescinded trade with T.G. Motors and enclosed in the sight draft submitted by Turtur. I find from the credible evidence that this provisional credit given Turtur by the bank was in fact a loan made by the bank to Turtur.

### 3. Four Car Purchase [8]

The testimony offered by T.G. Motors was that the agreement with Turtur was a cash sale of four cars in its inventory to Turtur. However, Turtur offered testimony that an eight car trade, four from each

dealer, was contemplated. Chris Turtur, President of C.M. Turtur Investments, Inc., testified that in January 1988, Turtur and T.G. Motors entered into a dealer trade consisting of eight cars, four cars from each dealer. The drafts deposited by T.G. Motors against Turtur's account were credited to T.G. Motors' account immediately by Bellfort. However, Turtur informed by Bellfort to "pick up" the drafts, never did so. Four cars were delivered to Turtur from T.G. Motors and four cars were delivered by Turtur to T.G. Motors.

Bellfort never charged Turtur's account for the four drafts submitted by T.G. Motors upon which it received immediate credit. Turtur testified that the bank was selecting the drafts that Turtur should "pick up" because the bank had held some drafts chargeable against Turtur's account too long. Turtur testified that the MSOs representing the four cars out of T.G. Motors' inventory were held by Bellfort until Turtur could cover the drafts because the bank knew that Turtur had insufficient funds in its account. Further, Turtur testified that Bellfort accepted T.G. Motors' drafts against Turtur's account on Turtur's behalf.

I find the most credible evidence to be that Bellfort paid T.G. Motors for the four cars traded to Turtur by giving T.G. Motors immediate credit on the drafts drawn on Turtur's account. I find that Bellfort held these four drafts for a period of almost one month until Turtur filed his Chapter 11 petition without charging Turtur's account for such drafts.

Bellfort continued to hold the drafts for Turtur until March 1988 (postpetition) when Bellfort, pursuant to an oral agreement with T.G. Motors, charged back the amount of the four drafts submitted against Turtur's account. The two drafts relating to the "two car sale" upon which Turtur was given immediate credit by Bellfort were also charged back against T.G. Motors' account pursuant to this agree-

---

**8.** Again, the term "four car purchase" (like the term "two car sale") is somewhat of a misnomer in light of my finding that the transaction involved an exchange of eight cars. My reason for doing so is also the same—the parties throughout the hearing referred to the exchange as the "four car purchase". The term does fit in that from the perspective of Turtur, it did "purchase" four cars from T.G. Motors for which T.G. Motors was paid by Bellfort.

ment. Bellfort and T.G. Motors attempted to return title to the vehicles to T.G. Motors by T.G. Motors "paying" Bellfort for the unpaid drafts of Turtur. At the end of April 1988, T.G. Motors executed two notes to Bellfort collateralized by seventeen cars, including the six cars at issue here. In addition, T.G. Motors gave Bellfort a security interest in all seventeen cars, which was never perfected, nor was notice given to NMAC regarding the grant of the security interest.

Nissan Motors Corporation maintains an inventory computer system for all of its dealers. A dealer can inquire into the inventory of another dealer by merely obtaining the information from the computer system. With respect to the "two car sale" which was never consummated between the two dealers, the computer system showed that the two cars in the possession of Turtur were never transferred on the computer inventory system from Turtur to T.G. Motors. However, the computer system showed that T.G. Motors transferred four cars from its inventory to that of Turtur's at the time of the consummation of the "four car purchase." This evidence as to the intent of the parties and NMAC's knowledge was important.

### III. CONCLUSIONS OF LAW

■ The first issue I must decide is whether a contract, to be executory, requires material performance to be due on both sides of the contract or whether performance due by only one party is sufficient to make the contract executory. 11 U.S.C. § 365(a) provides "... the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." Nowhere is the term "ex-

ecutory contract" defined in the Bankruptcy Code. The legislative history for the section contemplates mutuality of obligations by stating that executory contracts "generally include contracts on which performance remains due to some extent on both sides." S.Rep. No. 989, 95th Cong., 2d Sess. 58, U.S.Code Cong. & Admin.News 1978, 5787. Professor Countryman who has written extensively on this subject also reaches a definition embracing the concept of mutuality of obligations by defining an executory contract as:

> a contract under which the obligations of both the debtor and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). The Supreme Court also recognized the mutuality of obligations concept in executory contracts in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984).[9]

Countryman explained that to understand the concept of executory contracts in bankruptcy, one must look to the purposes behind the power of the trustee to assume or reject an executory contract. Countryman, *supra*, at 450. The trustee must act to benefit the estate and thus, presumably, he will reject those contracts that are onerous to the estate and assume those that benefit the estate.

Performance remaining due by one of the parties to the contract should not, according to Countryman, give the trustee the power to assume or reject the contract. *Id.* at 456. Other powers of the trustee (or

**9.** Two definitions of executory contracts can be gleaned from Countryman's definition and the definition contained in the Senate Report, which was adopted by the Supreme Court in *Bildisco*. A contract with "performance due to some extent on both sides" may not meet the more stringent test of Countryman's definition since his definition requires the contract to be so unperformed on both sides that failure of either party to perform would give rise to a material breach.

A third approach to defining executory contracts looks to the policies underlying the Bank-

ruptcy Code, determining that a contract is executory or nonexecutory on the basis of consistency with such policies. *See, e.g., Martin Bros. Toolmakers, Inc. v. Indus. Dev. Bd. (In re Martin Bros. Toolmakers, Inc.)* 796 F.2d 1435, 1439 (11th Cir.1986); *In re Becknell & Crace Coal Co.,* 761 F.2d 319, 322 (6th Cir.1985). This definition is result-oriented and has been employed primarily to prevent forfeitures of property of the estate and windfalls to third parties. *See* Julis, *Classifying Rights and Interests under the Bankruptcy Code,* 55 AM.Bankr.L.J. 323 (1981).

debtor in possession) come into play. If the creditor has fully performed, he may have provided an asset to the debtor's estate. The trustee pursuant to 11 U.S.C. § 554 has the option of either accepting the asset or abandoning it. However, the trustee may abandon the asset only if the asset is "burdensome" or "of inconsequential value and benefit" to the debtor's estate. *See* Bankruptcy Code § 554(a). If the trustee accepts the asset, this should not to be construed as the assumption of an executory contract so as to elevate an unsecured obligation to a first priority administrative expense. *Id.* at 457. *See also* §§ 503(b)(1)(A) and 507(a)(1). If the trustee abandons the property, this should have no effect on the party having fully performed who obviously will have a claim for the price. *Id.* at 457. *See also* Bankruptcy Code § 501(a). This claim, however, will be an unsecured claim rather than an administrative expense priority.

In the case of full performance by the debtor, the performance due the debtor creates an asset which will normally pass to the debtor's estate. *See* 11 U.S.C. § 542. If the trustee accepts the asset of performance due, then the creditor owes performance to the trustee. If rejected by the trustee, the liability for performance is owed to the debtor as before bankruptcy. *Id.* at 459. "The legislative purpose underlying Section 70b (predecessor to Sec. 365) was to solve the problem of *assumption of liabilities.*" 2 *Collier on Bankruptcy*, P. 365.01 (14 Ed.1987). (Emphasis added.) Clearly, Section 365 resolves the problems that arise with respect to *liabilities* of the debtor's estate and not with the assumption or rejection of assets to the debtor's estate. Other powers of the trustee address the issue of assets of the debtor's estate.

Other circuits that have addressed the issue have adopted either Countryman's or the Senate Report's definition of an executory contract. These cases bear out the necessity of performance due on both sides for the contract to be executory in bankruptcy applications. *See Collingwood Grain, Inc. v. Coast Trading Co., (In re Coast Trading Co.)* 744 F.2d 686 (9th Cir.

1984) (contract for the sale of grain, delivery to be F.O.B. the stockyards, was held to be executory because at the time of filing the petition in bankruptcy, *delivery* had not been completed—the grain was *enroute* to the stockyards and the debtor was to pay the price.); *Lubrizol Enter. v. Richmond Metal Finishers, Inc., (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043 (4th Cir.1985) (license agreement was held to be executory where the debtor was under an obligation to forebear arising out of a most favored licensee clause and the other party was to pay royalties); *Northwest Airlines, Inc. v. Klinger, (In re Knutson)*, 563 F.2d 916 (8th Cir.1977) (contract between an airline and a purchaser of tickets was held to be executory where the tickets were received, but not used and not paid for; the airline had the obligation to transport the debtor and the debtor had the obligation to pay for the tickets); *Bankers Trust Co. v. Gibbon, (In re Chicago, Rock Island & Pacific R.R. Co.)*, 604 F.2d 1002 (7th Cir.1979) (guaranty agreement held *not* to be an executory contract after the bonds had been issued and the consideration paid); *Chattanooga Memorial Park v. Still, (In re Jolly)*, 574 F.2d 349 (6th Cir. 1978) (contract for burial plots breached by debtor and reduced to final judgment prior to filing a petition in bankruptcy was held *not* to be an executory contract because there was nothing for the debtor to do in the future, he breached his duty and a final judgment had been entered against him).

In case law to date, the Fifth Circuit has defined executory contracts as follows:

> [A] contract is executory when something remains to be done by one or more of the parties. An executory contract is one in which a party binds himself to do or not to do a particular thing, whereas an executed contract is one in which the object of the agreement is already performed.

*In re American Magnesium Co.*, 488 F.2d 147, 152 (5th Cir.1974). *See also In re Jackson Brewing Co.*, 567 F.2d 618 (5th Cir.1978); *In re Tonry*, 724 F.2d 467 (5th Cir.1984). The Fifth Circuit's definition would seem to vary significantly from

Countryman's, as well as the Senate Report's, definition by requiring performance due on *one side* only to create an executory contract.

The Fifth Circuit's *American Magnesium Co.* definition of executory contracts has its roots in two United States Supreme Court decisions. The first, *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810) defines a contract as:

> ... a contract between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do or not to do, a particular thing; ... A contract executed, as well as one which is executory contains obligation binding on the parties.

*Id.* 10 U.S. (6 Cranch) at 136. The second Supreme Court case, *Farrington v. Tennessee*, 95 U.S. 679, 683, 24 L.Ed. 558, 559 (1878), defines an executory contract as "one where it is stipulated by the agreement of minds, upon a sufficient consideration, that something is to be or not to be done by one or both of the parties." *Id.* 95 U.S. at 683, 24 L.Ed. at 559.

Clearly, these two Supreme Court decisions refer to those contracts where some obligation remains to be performed by one party to a contract in a *nonbankruptcy* situation. But distinctions must be made, as Countryman does, in the application of the term "executory contract" in bankruptcy. For rejection or assumption of an executory contract under Section 365(a) to have meaning, then performance must be due on *both sides* to avoid the potential of elevating a creditor's provable claim to the level of an administrative expense in any case where the debtor or the trustee wants to retain a valuable asset. *See* Bankruptcy Code Sections 503(b)(1)(A) and 507(a)(1). In my opinion, defining executory contracts under bankruptcy law to include those contracts where performance is due on one side only would sweep many prepetition unsecured claims within Section 365, giving these claims an administrative priority expense status. If a definition of performance due on one side were carried to its extreme, then there would be little need for the trustee's power to abandon property or to seek turnover of property since virtually all contracts have some performance due to some extent on one side.[10]

Within the Fifth Circuit, there appears to be a split of authority at the trial level, but the following cases discussed and adopted the Countryman definition: *Dolphin Titan International, Inc. v. Gray & Co.*, (*In re Dolphin Titan International*), 93 B.R. 508 (Bankr.S.D.Tex.1988) (copy attached) (contract held not to be executory); *In re Placid Oil Co.*, 72 B.R. 135 (Bankr.N.D. Tex.1987) (contract held not executory because the only remaining duty was the payment of the money); *Wilson v. TXO Prod. Corp.* (*In re Wilson*), 69 B.R. 960 (Bankr.N.D.Tex.1987) (oil and gas contracts held to be executory). The *Dolphin Titan International* court notes that the cases following *American Magnesium* "involved significant unperformed duties on both sides." *Dolphin Titan International, supra* at 511.

I believe that the more correct case law and position on the issue is that an executory contract, as that term is used in 11 U.S.C. § 365, requires a performance to be due from each of the parties to a contract. A contract with an obligation due only by one side does not fit in with the remaining scheme of debt status under the Bankruptcy Code giving similarly situated creditors differing claim status. Moreover, the respective balance of powers between debtors attempting to reorganize and unsecured creditors is disrupted by an enlargement of an administrative priority class for those creditors who can point to some performance due on one side. The Fifth Circuit has not had this issue directly presented to it but I believe that it would define executory contracts to be those where there are duties remaining on both sides.

---

**10.** Professor Williston has noted that "all contracts to a greater or lesser extent are executory. When they cease to be so, they cease to be contracts." 1 S. Williston, Contracts Section 14 (3d Ed.1957).

### 1. The Two Car Sale

■ Applying the above facts and legal analysis, I conclude that the "two car sale" is not an executory contract that must be assumed or rejected by Turtur. T.G. Motors breached its contract with Turtur by informing Turtur later the morning of the proposed trade that it would not perform on the contract, even though Turtur had partially performed by delivering drafts to Bellfort. Turtur had three options in dealing with T.G. Motors' repudiation: (1) to treat his remaining duties to render further performance as discharged; (2) to insist on adequate assurances of performance from T.G. Motors; or (3) to ignore the repudiation and await T.G. Motor's performance. *E. Farnsworth, Contracts* 637 (1982). The facts show Turtur treated the repudiation of the trade as a discharge of its remaining duties to T.G. Motors. The contract was terminated. Turtur could have sued for breach of the entire contract if the contract were otherwise enforceable. To date, it has not done so. In any event, a terminated contract can in no way be executory. 11 U.S.C. § 365 therefore does not apply to the two car sale. Even if I were incorrect in my findings that the sale was really a four car trade and the agreement was for the outright sale of two cars by Turtur to T.G. Motors, the contract would still not comply with the "performance due on both sides" standard I adopt here for a finding of an executory contract. The only remaining performance due would be delivery of the vehicles by Turtur. T.G. Motors had paid for the cars. It had no performance still due. Therefore, no matter which version of the facts is believed, the result is the same—no executory contract.

Because I have found the immediate credit to be a loan to Turtur from Bellfort and the contract was for a trade of four cars and not two, I conclude that the contract between T.G. Motors and Turtur as to the "two car sale" was terminated. Termination was effected by T.G. Motors' anticipatorily repudiating the contract and by the conduct of Turtur in treating the breach of the contract as a discharge of his further obligations under the contract. The contract, having been terminated, can-not be executory. This is not to say that a proof of claim cannot be filed by T.G. Motors in Turtur's case. I am merely holding that there is no executory contract involved in this transaction, and therefore Bankruptcy Code Section 365 does not apply.

### 2. The Four Car Purchase

■ Having found that Turtur and T.G. Motors were obligated to deliver four cars to each other, I conclude that the contract is not executory because performance on both sides has been completed. Both dealers submitted sight drafts for each of the vehicles involved in the trade and the cars were exchanged pursuant to their agreement. It is immaterial that Bellfort advanced funds to T.G. Motors based upon the deposit of sight drafts against Turtur's account for the four cars T.G. Motors traded to Turtur. T.G. Motors was paid for the cars whether or not Turtur paid for them out of its own funds or whether someone else (Bellfort) paid for them by virtue of a loan to Turtur.

T.G. Motors contends that it paid for the cars (or rather, it did not get paid) due to the collateral agreement between T.G. Motors and Bellfort executed in March 1988. Bellfort charged the four drafts drawn on Turtur's account against T.G. Motors' account after Turtur filed for Chapter 11 protection. This agreement is immaterial to the consideration before me. I look only to the status of the contracts as of the date Turtur filed its petition. At that point, the contracts were not executory because the obligation on both sides had been fully performed.

■ Even if I am incorrect in finding that the agreement was an eight car trade and the agreement between T.G. Motors and Turtur was for an outright purchase of four cars by Turtur from T.G. Motors as T.G. alleges, the contract would still not be executory, because only one side remained obligated: T.G. Motors was paid by Bellfort on behalf of Turtur, but T.G. Motors remained obligated to deliver the title documents and the MSOs to Turtur. T.G. Motors bases its claim on the collateral

agreement with Bellfort in March 1988. The collateral agreement of T.G. Motors and Bellfort is void or voidable under the automatic stay provision of 11 U.S.C. § 362(a) as affecting Turtur's property or Turtur's interest in property since relief from the automatic stay was not sought prior to the agreement. It can have no affect on the sale between Turtur and T.G. Motors. My conclusion does not foreclose any party from filing a proof of claim against Turtur's estate for monies due but unpaid at the Chapter 11 filing.

### 3. The Security Interests of Bellfort

Bellfort, as intervenor, asserts it has a valid, although unperfected, security interest in the six vehicles in Turtur's possession. Bellfort's claim to a security interest is premised upon an unwritten agreement with T.G. Motors which resulted in T.G. Motors granting it a lien on the vehicles in March 1988. It contends that its liens are superior to the liens of T.G. Motors and NMAC by virtue of (1) its possession of the MSOs and title documents held in the sight drafts it held which Turtur never "picked up" or paid, and (2) the grant of a security interest in the MSOs by T.G. Motors.

On March 21, 1988, Bellfort reversed the credits given for the "four car purchase" to T.G. Motors in January 1988. In addition, the bank charged T.G. Motors' account for the two drafts drawn on T.G. Motors' account with respect to the "two car sale". These acts were made in furtherance of an agreement between T.G. Motors and Bellfort. Bellfort agreed to loan T.G. Motors the money to pay off the drafts charged against its account.

In late April 1988, T.G. Motors signed two notes collateralized by seventeen cars including the six at issue here. With each note given by T.G. Motors, a security agreement was also given in seventeen cars in favor of Bellfort. At that time, Bellfort was in possession of the MSOs to all six vehicles at issue. In June 1988, I ordered Bellfort to turnover the MSOs for the six vehicles to Turtur to be held in escrow pending the resolution of this motion.

Bellfort has two alleged sources of security interests involved in this suit. The first is the security interest obtained by a collecting bank to the extent credit is given and withdrawn on a deposited item. The security interest extends to the item and any accompanying documents or the proceeds. Tex.U.C.C. § 4.208(a)(1). However, this issue was addressed by me in my prior turnover order in which I concluded that Bellfort did not have a security interest in the MSOs and the certificates of title that accompanied the drafts. *C.M. Turtur Investments, Inc. v. Bellfort National Bank (In re C.M. Turtur Investments, Inc.),* Case No. 88–01606–H5–11 (Bankr.S.D.Tex. filed June 8, 1988) (copy attached). In order to establish a lien through possession, the owners of the documents must have the intent to give the documents to the bank as security. Such is not the case with the MSOs here. The MSOs were not given to the bank as security for the payment of the draft itself, but merely accompanied the draft to expedite the payment. This is not to say that the draft itself would not act as security for the bank to the extent that credit given on the draft had been withdrawn.

My order of June 8, 1988, was affirmed by the District court on September 14, 1988. *C.M. Turtur Investments, Inc. v. Bellfort National Bank (In re C.M. Turtur Investments, Inc.),* H–88–2215 (S.D. Tex. filed September 14, 1988). The District Court agreed that a security interest in documents accompanying a draft does not act as security for the bank which extends credit on it, unless the enclosed documents were intended to secure the credit. Further, the District Court affirmed the point that the MSOs and documents of title are not negotiable instruments that can dispose of property. Therefore, it is clear that the Tex.U.C.C. 4.208 security interest extends only to the draft instrument itself and not to the documents contained inside, absent intent to secure the payment of the draft. Nor does the security interest attach to the vehicles themselves as Bellfort contends.

■ The second source for Bellfort's security interest is the one obtained from T.G. Motors by their oral agreement. Again, Bellfort cannot prevail on its contention that it has a superior secured interest in the vehicles. First, Bellfort has no security agreement with Turtur. Second, the security agreement between T.G. Motors and Bellfort is a collateral agreement and is void or voidable under Bankruptcy code Section 362 as an act affecting Turtur's property or Turtur's interest in property. Third, Bellfort did not have a legal right to exact a security interest from T.G. Motors for the unpaid drafts. Tex.U.C.C. § 4.301(a)(2) provides that a payor bank may revoke a provisional credit and recover any payment if the revocation takes place before final payment is made and before its midnight deadline.

Tex.U.C.C. § 4.104(8) defines the "midnight deadline" as the midnight on the next banking day following the banking day on which the relevant item is received. Tex.U.C.C. § 4.302 provides that a payor bank is accountable for the amount of a demand item, regardless of whether it is also the depository bank, if it fails to pay or return the item or send notice of dishonor until after its midnight deadline.

Clearly, as to Turtur, Bellfort became accountable for the face amount of the drafts submitted in the "two car sale" and the "four car purchase" because all the drafts involved were never charged to any account until March 1988, one month or more after Bellfort received these drafts for deposit. The fact the T.G. Motors and Bellfort agreed to charge back T.G. Motor' account is immaterial to my decision here. It is clear that the bank had no enforceable right to charge back against either T.G. Motors' or Turtur's account. The bank's right to charge back under Tex.U.C.C. § 4.212 is conditional upon the item being returned or notice of the facts sent before the bank's midnight deadline and this did not occur in this case. Bellfort may have an unsecured claim against Turtur, but not a secured claim.

### 4. The Security Interest of NMAC

■ NMAC intervenes in this proceeding to protect its security interest in the inventory of Turtur against Bellfort's claim of a superior lien in the six vehicles in dispute. NMAC and Turtur executed a Wholesale Financing and Security Agreement, Retail Plan, Retail Lease Plan, and a Dealer Loan on about July 17, 1987. The agreements grant NMAC a security interest in, *inter alia,* all vehicle inventory, including after-acquired assets and proceeds. Further, NMAC's security interest was perfected by the filing of UCC–1 Financing Statement with the Secretary of State. Bellfort has not perfected it security interest by filing a UCC–1 pursuant to Article 9 of the Tex.U.C.C. NMAC's security interest has priority over Bellfort's security interest pursuant to Tex.U.C.C. 9.312(e)(1) because NMAC had perfected its security in the property whereas Bellfort did not.

Both Bellfort and T.G. Motors contend that NMAC's security interest in the four cars traded to Turtur out of T.G. Motors inventory was paid off. However, even though vehicles are paid off with respect to a security interest does not mean that a security interest can't reattach. This was the case with the four cars received by Turtur as inventory secured by NMAC's security interest. I conclude that NMAC has a valid, perfected and superior security interest in the inventory of Turtur including after-acquired assets and proceeds. This does not mean that Bellfort does not have an enforceable security interest as against T.G. Motors.

### IV.  CONCLUSION

With respect to the above discussion, it is my conclusion that the vehicles in Turtur's possession properly belong to it, subject to NMAC's valid and enforceable security interest. Bellfort may have valid claims against Turtur's estate. This opinion is not intended to foreclose any party's right to file a proof of claim against Turtur's estate. However, it is clear that the agreement between Bellfort and T.G. Motors executed in March 1988 is collateral to the resolution of the issues before me. Addi-

tionally, such agreement would be void or voidable under the automatic stay provision of the Bankruptcy Code. Finally, NMAC has a valid, perfected and enforceable security interest in Turtur's inventory, including after-acquired assets and proceeds. Bellfort's security interest is not valid or enforceable against Turtur or Turtur's estate.

THEREFORE, IT IS ORDERED that: (1) T.G. Motors' motion to compel Turtur to assume or reject executory contracts is denied; (2) Turtur is the owner of the vehicles in question and they are not subject to any security interest of Bellfort National Bank; and (3) the vehicles are and continue to be subject to the valid and enforceable security interest of Nissan Motors Acceptance Corporation.