**In re: MCORP FINANCIAL, INC., MCorp Management, and MCorp, Debtors.**

**Bankruptcy Nos. 89–02312–H3–11, 89–02324–H5–11, 89–02848–H2–11 and 89–02312–H3–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

April 30, 1990.

D.J. Baker, Houston, Tex., for debtors.

John Flowers, Locke, Purnell, Rain & Harrell, Dallas, Tex., for Principal Mut. Life Ins. Co.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

Debtor MCorp has moved to Reject Lease/Contract with Tower Center Development Associates, Ltd. Partnership ("Tower Center"). Principal Mutual Life Insurance Company ("Principal Mutual") opposes, claiming the agreement is not a lease or executory contract subject to rejection. After considering the evidence, briefs, and argument of counsel, the court concludes Principal Mutual is correct, and issues the following Memorandum. To the extent any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent any conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

MCorp and Tower Center Development Associates, Ltd. Partnership are assignees of a lease referred to as the "Master Lease," pursuant to which MCorp is the

lessee and Tower Center is the lessor. MCorp is currently obligated under the Master Lease. It became effective on March 15, 1977 upon the signatures of the Trustees of General Electric Pension Trust, and Office Building Managers, an MCorp affiliate. These were the respective predecessors in interest of Tower Center and MCorp. The "Master Lease" was amended in 1984 by a Modification Agreement. Under the Master Lease as amended, MCorp had the right to occupy an office complex in downtown Dallas, Texas known as the "Old Mercantile Premises." MCorp seeks to reject the Master Lease pursuant to Section 365 of the Bankruptcy Code.

Although the Master Lease may have been a "true lease" in 1977, the 1984 modifications or amendments changed its character. The amendments involved financing arrangements whereby Tower Center was to purchase the Old Mercantile Premises from General Electric Pension Trust (GEPT). On June 22, 1984 Tower Center became the lessor under the Master Lease when it purchased the Old Mercantile Premises from GEPT for approximately Fifty–Six Million Dollars ($56,000,000.00). Principal Mutual Loaned Tower Center Forty–Nine Million Dollars ($49,000,000.00) to purchase Old Mercantile Premises in return for Tower Center's promissory note, which was secured on a fully nonrecourse basis by the Old Mercantile Premises. In addition, Tower Center gave Principal Mutual approximately Sixteen Million Dollars ($16,000,000.00) in letters of credit and assigned to Principal Mutual the Master Lease. Principal Mutual agreed to make the loan to Tower Center only if there was a "bond type master lease" obligating MCorp to pay approximately Four Million Five Hundred Thousand Dollars ($4,500,-000.00) per year to Principal Mutual, plus costs of operation and management of Old Mercantile Premises. Principal Mutual relied on the good will and reputation of an institution of the stature of MCorp in agreeing to the nonrecourse obligation of Tower Center. PML Ex. No. 2; Tr. p. 25.

MCorp occupied the Old Mercantile Premises until Momentum Place was completed in 1987. MCorp was to remain in the Master Lease to facilitate the loan process to Tower Center (since the loan was on a nonrecourse basis as to Tower Center). MCorp was to satisfy its obligations under the lease by creating Elm Block (a partnership composed of MCorp subsidiaries and Cadillac Fairview subsidiaries) which promised to indemnify MCorp against the Master Lease payments to Tower Center. PML Ex. No. 12; Tr. pp. 18–22. The amendment to the Master Lease in 1984 secured Principal Mutual's loan commitment by requiring MCorp to pay its rent directly to Principal Mutual, and accommodated MCorp by allowing MCorp to vacate the Old Mercantile Premises and relocate to Momentum Place. Elm Block's indemnity to MCorp was to insulate MCorp from liability for rent payments. PML Ex. No. 12; Tr. pp. 18–22.

### A. Executory Contract Question

■ Pursuant to Section 365 of the Bankruptcy Code, a debtor may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The point in time for determining whether a contract is executory is the date the bankruptcy petition is filed. *In re Fryar*, 99 B.R. 747, 749 (Bankr.W.D.Tex. 1989); *In re C.M. Turtur Investments, Inc.*, 93 B.R. 526, 535 (Bankr.S.D.Tex.1988). The original petition for Debtor MCorp was an involuntary Chapter 7 petition filed March 21, 1989. An Order for relief in Chapter 11 was entered March 31, 1989.

■ "Executory contract" is not defined in the Bankruptcy Code or in the Bankruptcy Act of 1898. This court, among others, has applied the "Countryman definition." *In re Dolphin Titan International, Inc.*, 93 B.R. 508 (Bankr.S.D.Tex.1988); *In re Wilson*, 69 B.R. 960 (Bankr.N.D.Tex.1987); *In re C.M. Turtur Investments, Inc.*, 93 B.R. 526 (Bankr.S.D.Tex.1988); *In re Fryar*, 99 B.R. 747, 748 (Bankr.W.D.Tex. 1989). The Fifth Circuit Court of Appeals also applies the "Countryman definition." *Ozark–Mahoning Co. v. American Magnesium Company (In re American Magnesium Company)*, 488 F.2d 147 (5th Cir.1974); *Rivercity v. Herpel (In re Jackson Brew-*

*ing Co.),* 567 F.2d 618 (5th Cir.1978); *Tonry v. Herbert (In re Tonry),* 724 F.2d 467 (5th Cir.1984). Professor Vern Countryman's definition is:

> [A] contract under which the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973).

The definition includes two elements: 1. Obligations on both sides, and 2. Obligations sufficient to constitute a material breach if the obligations are not performed. This Court in *Dolphin Titan, supra,* noted that the Fifth Circuit has applied the term "executory contract," in certain circumstances, to mean one in which significant unperformed obligations exist on one side only. *Dolphin Titan, supra,* at 510, citing *In re American Magnesium Company, supra.* However, this Court did not apply the definition of executory contract as unperformed obligations on one side only in *Dolphin Titan* since to have done so would have led to an inequitable result, "representing a windfall to which the debtor would not have been entitled absent the filing of the bankruptcy...." *In re Dolphin Titan International, Inc. v. Gray & Co., Inc., supra,* at 511–512.

The Fifth Circuit's application in *In re American Magnesium Company, supra,* of "executory contract" to mean one in which obligations remain unperformed on one side only, derives from certain older United States Supreme Court applications. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810); *Farrington v. Tennessee,* 95 U.S. 679, 683, 24 L.Ed. 558, 559 (1878). However, these are cases which predated the earliest comprehensive United States Bankruptcy statute, the Bankruptcy Act of 1898. (11 U.S.C. 1 et seq.). As the Bankruptcy Court stated in *T.G. Motors, Inc. of Houston v. C.M. Turtur Investments, Inc., supra:*

> "distinctions must be made as Countryman does, in the application of the term 'executory contract' in bankruptcy. For rejection or assumption of an executory contract under Section 365(a) to have meaning, then performance must be due on both sides to avoid the potential of elevating a creditor's provable claim to the level of an administrative expense in any case where the debtor or the trustee wants to retain a valuable asset ... [or to prevent sweeping] many prepetition unsecured claims within Section 365, giving those claims an administrative priority expense status." *T.G. Motors* at 534.

■ Applying the Countryman definition to the facts in this case, this court finds that there were not on the petition date obligations due on both sides of the Master Lease as amended, such that the failure to perform by one would constitute a material breach excusing performance by the other, for purposes of 11 U.S.C. § 365. Indeed, on the petition date, *neither* Tower Center nor MCorp had such obligations.

MCorp claims that at the time the bankruptcy petition was filed, substantial obligations were owed by Tower Center to MCorp. Among these were the following:

1. Tower Center to provide rental space to MCorp in Old Mercantile Premises;

2. Tower Center to make mortgage payments and take any other actions as may be necessary to insure MCorp's and its subtenants' right to quiet use and enjoyment of the premises; and

3. Tower Center to continue to grant MCorp access to underground walkways associated with the property if the Old Mercantile Premises are redeveloped and the Master Lease is terminated.

With regard to the first obligation suggested above, Tower Center was not required to provide MCorp rental space in the Old Mercantile Premises as of March 21, 1989. In conjunction with MCorp's move to Momentum Place in 1987, MCorp had vacated the Old Mercantile space and had subleased it to some of MCorp's subsidiaries. In agreements such as the Non–Disturbance Agreement of February 28, 1986 and the Continental Building Lease of February 28, 1986, the subtenants protected their right to possession of the subleased

space by attornment agreements, insuring that if MCorp's lease should terminate with Tower Center, the subtenants would be protected in their use of specific space.

With regard to the second obligation suggested above, the Master Lease as amended is not an instrument or series of instruments which obligate Tower Center to make mortgage payments.[1] While the "Estoppel Letter" of June 22, 1984, (not part of the "Master Lease" by movant's definition) does address any failure of Tower Center to do so, it specifies that failure of Tower Center to pay Principal Mutual will not interrupt MCorp's use of the premises. PML Ex. No. 7, p. 3. It further provides for direct payment by MCorp to Principal Mutual in the event of failure of Tower Center to do so. Since the 1984 Modification Agreement, MCorp has made payments directly to Principal Mutual. PML Ex. No. 6, p. 5, para. 4(a).

While Tower Center may have obligations to various subtenants, the obligations derive from side agreements and subleases, not from "the lease" as defined in movant's Motion.

In addition, MCorp's witness, Mr. McGill, testified the agreement is structured such that there are no default provisions in the Master Lease relating to the lessor, Tower Center. All default provisions relate to lessee, MCorp. (General Convenants, p. 24, Art. 13 Conditional Limitations—Default Provisions.)

The third obligation suggested above, MCorp's right of access to an underground tunnel after the Master Lease terminates, is not an obligation Tower Center was obligated to perform on March 21, 1989, since the Master Lease had not (and to date has not) terminated following payment of the Forty–Nine Million Dollars ($49,000,000.00). The condition precedent had not occurred on that critical date—that is, MCorp had not paid the Forty–Nine Million Dollars ($49,000,000.00) to Tower Center.

Even were this obligation treated as one applicable on the petition date, the obligation is not so substantial as to render the agreement, which has so much the character of a financing arrangement, an executory contract subject to rejection pursuant to 11 U.S.C. § 365.

As discussed above, Tower Center's remaining obligations were on March 21, 1989 non-existent, insubstantial, or unenforceable, and thus were not sufficient to constitute a material breach if they remained unperformed.

MCorp, at that time, had the significant unperformed obligation of paying Tower Center Forty–Nine Million Dollars ($49,000,000.00) on the loan. In the legislative history regarding Section 365 of the Bankruptcy Code addressing executory contracts and unexpired leases, "a note is not usually an executory contract if the only performance that remains is repayment." H.Rep. No. 95–595, p. 347, 95th Cong., 1st Sess., pp. 5787, 6303–6304 (1977); Bkr.L. Ed., Legislative History § 82:16. In *In re Placid Oil Co.*, 72 B.R. 135 (Bankr.N.D. Tex.1987), the court held that where "the debtor's only duty under the Premium Agreement is to pay money," there is no executory contract for purposes of 11 U.S.C. § 365. *In re Placid, supra* at 138. MCorp's obligation to pay money, alone, does not render it a party to an executory contract within the "Countryman definition." The Master Lease as amended in 1984, is not an executory contract for purposes of 11 U.S.C. § 365.

### B. *The True Lease Question*

■ Alternatively, MCorp argues that the Master Lease is a true lease capable of rejection pursuant to Section 365 of the Bankruptcy Code. The Bankruptcy Code does not define the term "lease." "State law determines whether an agreement is a lease." *In re Harris Pine Mills*, 862 F.2d 217, 220, n. 5 (9th Cir.1988); *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In order to determine if a lease is a "true lease," one must look at the economic substance of the transaction rath-

---

1. Movant's amended Motion, Docket Sheet No. 75, identifies the lease as to which rejection is sought as Ex. A–E attached thereto. The court takes judicial notice of this Motion and attachments.

er than whether the transaction is labeled a "lease." *In re Harris Pine Mills,* 862 F.2d 217, 220, n. 5 (9th Cir.1988); *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 1186 (9th Cir.1988); *In re PCH Associates,* 804 F.2d 193, 200–201 (2nd Cir.1986); *See also,* S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5850; *In re Oerke,* 63 B.R. 1 (Bankr.N.D.Tex.1986). The evidence presented indicates that the Master Lease partakes more of the characteristics of a financial arrangement than of a true lease. The Master Lease as modified in 1984, and on the petition date, was more in the nature of a financing arrangement or of a guarantee by MCorp of repayment of the Forty–Nine Million Dollar ($49,000,000.00) loan, than of a true lease. The following elements of the agreement contribute to this conclusion:

1. The Master Lease as amended terminates if the Forty–Nine Million Dollar ($49,000,000.00) loan is repaid to Principal Mutual. PML Ex. No. 6, pp. 11–12, para. 18. Thus termination of the agreement is not connected to occupancy of the premises.

2. Under the Master Lease as amended, MCorp had to pay Principal Mutual "no matter what." A failure of title in Tower Center, which ordinarily would excuse MCorp from paying rent to Tower Center, would not excuse MCorp from paying Principal Mutual under the terms of the Master Lease. Tr. pp. 22, 41. PML Ex. No. 1, p. 18, para. 7.

3. MCorp's subsidiary, MCorp Properties, entered into a separate space lease as to Old Mercantile Premises that was independent of and expressly survived any termination of the Master Lease. PML Ex. No. 8; Tr. pp. 34, 40.

4. Under the Master Lease as amended, the expiration date of the Master Lease and the maturity of the loan exactly coincide. In addition, Tower Center's loan payments to Principal Mutual are due on the same date as MCorp's payments under the Master Lease. Indeed, the Master Lease payments are wire-transferred directly from MCorp to Principal Mutual. PML Ex. No. 6, p. 5, para. 4(a).

5. Pursuant to the side agreements of October, 1984 and July, 1986, on its petition date MCorp had no rights under the Master Lease to occupy the property. Under the side agreements, MCorp actually contracted away its rights to management or leasing of the property. PML Ex. No. 6, pp. 3–4, para. 2; PML Ex. No. 10, pp. 4–5, para. 2.

It is not necessary for the court to decide exactly what the transaction embodied in the "Master Lease" as amended, is, if it is not a true lease. It is sufficient for the court to find and hold that the economic substance of the transaction creates a financial arrangement. *In re PCH Associates,* 804 F.2d 193, 201 (2nd Cir.1986). "Simply because this interest is not easily categorized as a security agreement, a joint venture, a sale and leaseback, or some other common financing scheme, does not compel the conclusion that it is a lease subject to the strictures of Section 365." *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 1186 (9th Cir.1988).

Because the Master Lease, as amended in 1984, between MCorp and Tower Center is neither an executory contract nor an unexpired lease but rather a financial device, MCorp may not reject the Master Lease as amended pursuant to Section 365 of the Bankruptcy Code.

## JUDGMENT

This Judgment is based upon a separate Memorandum Opinion which includes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. It is hereby,

ORDERED that the motion of Debtor MCorp To Reject Executory Contract with Tower Center Development Associates Limited Partnership pursuant to 11 U.S.C. § 365, is Denied.