**In re OKLAHOMA TRASH CONTROL, INC., Debtor.**

**No. 00–03259–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Feb. 1, 2001.

Todd M. Henshaw, Tulsa, OK, for debtor.

John M. Carwile, Tulsa, OK, for Bank of Chelsea.

Mark H. Ramsey, Claremore, OK, for Town of Chelsea.

Melinda J. Martin, Tulsa, OK, for John & Gloria Lewis, d/b/a John's Trash Service.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

THIS MATTER comes before the Court pursuant to the Motion for Authority to Assume Executory Contract (the "Motion") filed by Oklahoma Trash Control, Inc., Debtor herein ("Debtor" or "OTC"). A hearing on the Motion was held on January 25, 2001. Debtor appeared by and through its attorney, Todd M. Henshaw. The Bank of Chelsea ("Bank") appeared by and through its attorney, John M. Carwile. The Town of Chelsea (the "Town") appeared by and through its attorney, Mark H. Ramsey. John and Gloria Lewis, d/b/a John's Trash Service (the "Lewises"), appeared personally and through their attorney, Melinda J. Martin. The Court received evidence and provided the parties with the opportunity to submit closing argument in the form of letter briefs, all of which were submitted on or before January 30, 2001. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52, which are made applicable to this matter by Bankruptcy Rule 9014.

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this matter is proper pursuant to 28 U.S.C.A. § 157(a). It is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A).

### Burden of Proof

"In a proceeding under § 365, the party moving to assume a lease [or contract] has the ultimate burden of persuasion that the lease [or contract] is one subject to assumption and that all requirements for assumption have been met." *In re Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr.W.D.Tenn.1990) (citations omitted).

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2001).

## Findings of Fact

OTC is an Oklahoma corporation which, prior to August 28, 2000, was engaged in the business of commercial and residential trash removal. The chief executive officer of OTC is Mr. Buddy Hatfield ("Mr. Hatfield"). Mr. Hatfield assumed control of OTC in June of 1998. In June of 1999, Mr. Hatfield expanded the business of OTC. At its peak, OTC had approximately 20 employees, operated six trash trucks, and had over 10,000 customers. The Bank was the major creditor of OTC, and was owed a debt in excess of $1.2 million in August of 2000.

On July 1, 2000, OTC entered into a contract (the "Contract") with the Town to provide for pickup and disposal of all of the commercial and residential trash for the Town. Under the terms of the Contract, OTC was to receive the sum of $6.52 per month per household (less a seven per cent service charge) for all residential trash pickup and disposal. Payment of these sums was guaranteed by the Town. The amount that OTC was to charge its business customers was left to negotiation between OTC and those businesses. The Contract was for a term of two years, and was subject to extension for an additional two-year period.

In the spring of 2000, OTC experienced a dramatic loss of employees. In August of 2000, the company had only three employees: Mr. Hatfield, Sandra Hatfield (Mr. Hatfield's wife) and their son (hereafter collectively referred to as the "Hatfields"). In an attempt to maintain the operations of OTC, the Hatfields began to work twenty-hour days, and seven-day weeks. They quickly became physically and emotionally exhausted.

On August 28, 2000, the Hatfields could stand no more the pressures of operating OTC. Mr. Hatfield called the Town and informed the Town that OTC was closing, and would not perform any further trash pickup.[2] Mr. Hatfield then caused OTC to file a petition for relief under Chapter 7 of the United States Bankruptcy Code. Mr. and Mrs. Hatfield filed personal Chapter 7 cases at the same time. When they filed the Chapter 7 cases, the Hatfields decided that they needed a long overdue vacation. They traveled to San Antonio, and from there took a cruise. The Hatfields decided to take the cruise the day they filed the bankruptcy cases, purchasing the tickets at the same time the case was filed. As a result, the Hatfields were absent from the Town for some period of time after August 28, 2000.

Upon the cessation of business by OTC, the Town was faced with an immediate need for trash disposal services. It turned to the Lewises, who began to collect residential and commercial trash immediately upon the Town's request. Although no formal contract was executed between the Town and the Lewises, the parties operated under the terms of the Contract. The Lewises continue to provide trash removal services to the Town.

Some time after this bankruptcy case was filed, Mr. Hatfield began to reconsider his decision to shut down OTC. The Bank, facing the possibility of a rather significant financial loss, supported the resumption of business by OTC. On November 6, 2000, OTC filed a motion to convert its Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code. *See Docket No. 28.* OTC sought to and was granted permission to employ Mr. Henshaw as its counsel. Under the terms of his agreement to represent OTC, the Bank paid the fees owed to Mr. Henshaw prior to his retention as counsel for OTC as a Chapter 11 debtor-in-possession, and guaranteed payment of Mr. Henshaw's fees thereafter, up to a

---

**2.** The evidence in this regard was a bit inconsistent. Mr. Hatfield testified that he spoke directly with Mr. Don Cochran, City Manager of the Town. Ms. Lola McMillan, the Utility Clerk for the Town, testified that she spoke to Mr. Hatfield, and relayed the message regarding the closing of OTC to Mr. Cochran. In any event, it is undisputed that on August 28, 2000, Mr. Hatfield informed the Town that OTC was ceasing business operations.

maximum of $20,000.00. *See Docket No. 39.* The motion to convert was granted on November 21, 2000. *See Docket No. 37.*

Shortly after the case was converted to Chapter 11, the Town filed a motion before this Court seeking an order that OTC was precluded as a matter of law from assuming the Contract. *See Docket No. 35.* On January 4, 2001, this Court denied the Town's motion as premature on the basis that OTC had not sought to assume the contract. *See Docket No. 60M.* Thereafter, on January 16, 2001, OTC filed the Motion. The Bank supports the Motion, while the Town and the Lewises oppose it.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

### Conclusions of Law

■ The issue before the Court is whether OTC should be allowed to assume the Contract and resume providing trash services to the Town. The parties to this litigation agree that, as a matter of the law, the filing of a bankruptcy case cannot resurrect an executory contract or unexpired lease which has expired prior to the filing of the bankruptcy case. *See Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1214 (7th Cir.1984), *cert. denied* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984) ("Where a contract has been validly terminated pre-bankruptcy, the debtors' rights to continued performance under the contract have expired. The filing of a petition under chapter 11 cannot resuscitate those rights.") (citation omitted); *see also Kopelman v. Halvajian (In re Triangle Laboratories, Inc.),* 663 F.2d 463, 467–68 (3rd

Cir.1981) ("... an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets.") (Bankruptcy Act case; citations omitted).[3]

■ The first question which this Court must answer is whether the Contract was terminated prior to the filing of this bankruptcy case. If so, the inquiry goes no further, and the Motion must be denied. While there is no Oklahoma law which the Court has been able to discover which is directly on point, the following provisions found in the Restatement of the Law of Contracts are most instructive:

### § 250. When a Statement or an Act Is a Repudiation

A repudiation is

(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or

(b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

. . .

### § 253. Effect of a Repudiation as a Breach and on Other Party's Duties

(1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

---

**3.** This conclusion is based upon the legal principle that "an executory contract, as that term is used in 11 U.S.C. § 365, requires a performance to be due from each of the parties to a contract." *T.G. Motors, Inc. v. C.M. Turtur Investments, Inc. (In re C.M. Turtur Investments, Inc.),* 93 B.R. 526, 534 (Bankr. S.D.Tex.1988). This principle was well stated by Professor Countryman, who defined an executory contract as

a contract under which the obligations of both the debtor and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.
Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn.Law Review 439, 460 (1973), quoted in *T.G. Motors, Inc.,* 93 B.R. at 532.

(2) Where performances are to be exchanged under an exchange of promises, *one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.*

*Restatement (Second) of Contracts* §§ 250, 253 (1981) (emphasis added). Debtor and the Bank contend that the pre-petition conduct of OTC, although admittedly a breach of the Contract, does not constitute its repudiation. The Court respectfully disagrees.

The Court has found as a matter of fact that:

(1) On August 28, 2000, OTC, through Mr. Hatfield, informed the Town that OTC had closed its operations and would no longer pick up trash for the Town under the terms of the Contract; and

(2) Immediately thereafter, the Hatfields left the State of Oklahoma for an extended period, thereby rendering it impossible for OTC to perform under the terms of the Contract.

Applying the legal principles set forth in the Restatement, the Court concludes that OTC repudiated the Contract prior to the filing of the bankruptcy case. Indeed, the conduct of OTC falls within both subsections of § 250. Not only did Mr. Hatfield, on behalf of OTC, inform the Town that OTC would no longer perform under the terms of the Contract, the fact that the Hatfields (the sole employees of OTC) left the state immediately thereafter rendered it impossible for OTC to perform under the terms of the Contract.[4] As a consequence of the conduct of OTC, under § 253 the Town is relieved of any and all obligations to perform under the Contract, and was so relieved prior to the filing of the bankruptcy case. Put simply, the Contract is no longer executory in nature, as the Town is no longer required to perform under its terms.

There is a paucity of case law on this issue. Most of the statements regarding the effect of repudiation are found in *dicta. See, e.g. American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589, 599 (7th Cir.1986) (alleged wrongful termination of distribution contract. "If you commit a material breach of contract, the other party can walk away from the contract without liability, and can do so as soon as you announce your intentions even if the time for the performance that you have repudiated hasn't arrived.") (citations omitted); *see also In re Murtishi,* 55 B.R. 564, 567 (Bankr.N.D.Ill.1985) (". . . when the debtor has not only failed to perform but has breached the contract pre-petition with the result that the other party has no further duty to perform but rather holds a claim against the debtor, the contract is no longer executory for purposes of § 365."). However, the Court has located one case which is arguably on point. In *T.G. Motors, Inc. v. C.M. Turtur Investments, Inc. (In re C.M. Turtur Investments, Inc.),* 93 B.R. 526 (Bankr.S.D.Tex.1988) (hereafter *"C.M. Turtur"*), the Chapter 11 debtor was an automobile dealership which had a contract with a non-debtor entity to exchange cars. Prior to the filing of the bankruptcy case, the debtor informed the non-debtor that it would not perform under the agreement. After the bankruptcy case was filed, the non-debtor filed a motion to compel the debtor to assume or reject the contract. The bankruptcy court, after an exhaustive analysis of the law of executory contracts, declined to compel assumption or rejection on the basis that the repudiation of the contract by the debtor operated as a termination of the contract. As it made the ruling, the court held that "[i]n

---

4. Illustration 7 to § 250 of the Restatement is most telling:

7. A contracts to employ B, and B to work for A, the employment to last a year beginning in ten days. Three days after making the contract B embarks on a ship for a voyage around the world. B's embarking for the voyage is a repudiation.

*Restatement (Second) of Contracts* §§ 250, cmt. c, illus. 7 (1981).

any event, a terminated contract can in no way be executory." *Id.* at 535.

### Conclusion

The Court concludes that, as a result of the pre-petition repudiation of the Contract by OTC, there is no executory contract left for OTC to assume. The Motion for Authority to Assume Executory Contract filed by Oklahoma Trash Control, Inc., Debtor herein, is denied.